*530 Opinion
MURRAY, J.
—Defendant Cesar Villa-Gomez appeals following a judgment of conviction after a jury trial. He was charged with multiple assault and gang-related counts arising out of a group attack on fellow prisoners in the Yuba County jail. The jury found defendant guilty, and he was sentenced to six years in state prison.
On appeal, defendant contends that the trial court erred in admitting his statements made in response to jail classification questions about his gang membership. In the published portion of this opinion, we conclude that the trial court did not err in allowing defendant’s statements concerning his gang affiliation made at booking. Because the crime for which defendant was prosecuted had not yet been committed at the time he answered the classification deputy’s questions, those questions were not reasonably likely to elicit an incriminating response. Thus, the questions did not amount to interrogation as defined in Rhode Island v. Innis (1980) 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 307-308, 100 S.Ct. 1682] (Innis), as applied by our high court in People v. Elizalde (2015) 61 Cal.4th 523 [189 Cal.Rptr.3d 518, 351 P.3d 1010] (Elizalde). Furthermore, any error in admitting these statements was harmless beyond a reasonable doubt.
Defendant also makes several other contentions which we address in the unpublished portion of this opinion. Defendant contends: (1) there is not sufficient evidence to support his conviction for simple assault; (2) there is not sufficient evidence to support the findings on the participation in a criminal street gang count and gang enhancements; (3) the trial court failed to properly instruct the jury that defendant’s knowledge that other participants were gang members is an element of the offense of active participation in a criminal street gang and the gang enhancement; and (4) the prosecutor’s comments during closing argument about the credibility of a police witness were prejudicial prosecutorial misconduct.
Our review has revealed an unauthorized sentence related to a count that was subject to Penal Code section 654.[1] On count 3, active participation in a criminal street gang, we order imposition of a full-term sentence instead of one-third the midterm imposed by the court and further order execution of that sentence stayed pursuant to section 654. (People v. Cantrell (2009) 175 Cal.App.4th 1161, 1164 [96 Cal.Rptr.3d 605].) We select the midterm because the trial court imposed a midterm sentence as the principal term and “undoubtedly” would impose and stay execution of that term on count 3 if we *531 were to remand. (People v. Alford (2010) 180 Cal.App.4th 1463, 1473 [103 Cal.Rptr.3d 898].) We otherwise affirm.
FACTUAL AND PROCEDURAL BACKGROUND
Charged Offenses and Enhancements
Defendant and codefendant Victor Hernandez were charged with assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); counts 1 & 2) and active participation in a criminal street gang (§ 186.22, subd. (a); count 3).[2] It was further alleged as to both assault counts that defendant and Hernandez committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).[3]
Trial Evidence
On January 8, 2011, a fight broke out among the prisoners in “B” pod of the Yuba County jail after a number of new prisoners were moved into the pod. One of those new prisoners was defendant. Prior to the fight, “B” pod was a “no-programming” pod, which meant that the prisoners housed in that pod were free to associate with one another and sleep anywhere they wanted without risking retaliation, regardless of ethnicity or gang affiliation. There were no bunk assignments in “B” pod.
Enrique Nunez was a prisoner in “B” pod on the day of the incident. He testified that he had been in custody there for two to three months, during which time there had been no problems. He was not a Norteño or otherwise gang affiliated, but the prisoners in “B” pod who were Norteños were known to everyone in the pod. At first, the Norteños in the pod did not program, but as new gang members arrived, the Norteños started hanging out, exercising together, and taking over the pod. On January 8, the “B” pod prisoners who were members of the Norteño gang decided that they “wanted to program,” and they “wanted to be close to each other just in case something happened.” The Norteños told non-Norteños to move to other bunks. Nunez testified that they told his non-Norteño bunkmate “he had to move because they needed that bunk because they wanted to be close to each other.”
Nunez approached Norteño gang member Lema Castro and told him he was not going to move because he was there first and if the Norteños wanted *532 to program, they should go to another pod. Castro told Nunez that they were going to program, asked Nunez what he was going to do about it, and thereafter began hitting Nunez. In an effort to defend himself, Nunez grabbed Castro by the neck and pushed him against the wall. As he did, three other Norteños, including Jesus Osuna, started hitting Nunez. Norteño Victor Hernandez ran down the stairs and struck Nunez in the forehead causing a cut. Vicente Serrano-Gomez, another prisoner who Nunez described as a Salvadorian, tried to help him and break up the fight, but the Norteños started hitting Serrano-Gomez as well. The fight eventually involved eight to 10 prisoners.
Nunez initially testified that he did not remember whether defendant was one of the new Norteños who had come into the pod. However, when his recollection was refreshed with a photograph depicting defendant’s appearance at the time of the attack, Nunez testified that he thought defendant was one of the men who attacked him. Specifically, upon showing Nunez defendant’s photo, the prosecutor asked, ‘“[W]as he in B pod?” Nunez responded, ‘“Yes. I think that is one of them. I don’t remember exactly, but I think that is one of them.” The prosecutor then asked, ‘“You think this is one of the ones that attacked you?” To which Nunez responded, ‘“Yes.” Later, when shown the photographic lineup in which he had previously identified defendant, Nunez’s recollection was refreshed that he had identified defendant in that lineup as the ‘“new guy” for whom the Norteños were making bunk space. After the prosecutor refreshed his memory with his initials on the photographic lineup, Nunez testified that defendant was ‘“the new guy that came in the cell the Norteños were making bunk space for.” When the prosecutor asked Nunez whether defendant ‘“was one of the guys that took part in the assault on [him],” he responded, ‘“Yeah, I think so. Yeah, because I didn’t have a lot of time to meet them. It was almost the same day or second day that they got there.” On cross-examination, Nunez definitively stated that defendant was one of the men “involved in the fight.” He explained that he did not recognize defendant initially because “[h]e is a little thinner, but it is him. I recognize him.” On redirect examination, Nunez again confirmed that defendant was the man he identified in the photographic lineup.
Serrano-Gomez testified that the Norteños were moving people around because a new Norteño came into the pod. When the group tried to remove another inmate from his bunk, Nunez went over to the group and said that it was not fair that they told that inmate to move. One member of the group then attacked Nunez from the front and another member attacked him from the back. When Serrano-Gomez tried to stop the fight, three people began beating him, including defendant and Hernandez. As a result, Serrano-Gomez sustained a cut to his eyebrow that bled. Shortly after the incident, Serrano-Gomez identified defendant in a photographic lineup as the new guy who had *533 moved into “B” pod. At trial, Serrano-Gomez identified defendant as one of the people who assaulted him. Serrano-Gomez did not see whether defendant hit Nunez.
Defendant was not in the jail pending criminal charges. He had been booked into the jail on an immigration hold. During the booking process, defendant was interviewed by Deputy Brandon Charter for classification purposes. Deputy Charter testified that the purpose of classification is ‘“[t]o appropriately house inmates that come into the jail to ensure their safety and officers’ safety.” Defendant told Deputy Charter he was a “Northerner” or Norteño.
Deputy Charter had training and experience with gangs in a custodial setting. Based upon this experience, he indicated that when there is a spontaneous fight between a Norteño and another prisoner, other Norteños are required to jump in and fight. If a Norteño fails to join in the fight, the gang makes him leave the pod and possibly assaults him.
Deputy Charter testified that after the fight, the guards checked the prisoners’ knuckles for redness, swelling, and scrapes, and those prisoners who had such injuries were “pulled out.” Deputy Charter further testified that defendant “was one of the people that was pulled out first” when the guards checked his knuckles, and the only reason he would have been pulled out is if his knuckles showed signs of fighting. He did not independently recall seeing defendant’s knuckles and conceded that his written report did not include a description of defendant having scrapes or redness on his knuckles. However, defendant did have red marks on his right eye and face.
Deputy Sean Moore testified as a gang expert. Based on his experience and the reports of the incident, Deputy Moore opined that the attack was gang related. He testified that all of the prisoners who took part in the assault, except for the victims, were validated as Norteños. Deputy Moore testified that Osuna admitted that he participated in the assault because he knew he would be “rolled out” of the gang or assaulted by its members if he did not. Osuna pleaded guilty to the misdemeanor charge of participating in a criminal street gang as a result. Castro was validated by Deputy Moore as a gang member for his participation in the attack. Timothy Evans also pleaded guilty to his participation in a criminal street gang and was validated as a gang member for his participation in the attack. Hernandez, who testified at trial that he was a Norteño at the time of the attack, was also validated as a gang member because of his participation in the attack and his multiple prior contacts with law enforcement as a gang member.
Deputy Moore opined that defendant was an active gang member at the time of the attack as well. He testified that his opinion was based on *534 defendant’s admission during classification that he was a Norteño, Serrano-Gomez’s identification of defendant as one of the Norteños who attacked him, defendant’s arrest with a gang for this gang-related offense, and his affiliation with the gang “because he was identified as the new person in the pod they were trying to make room for.” Additionally, Deputy Moore testified that based on his training and experience, the Norteños would not make room in the pod for a non-Norteño.
Deputy Moore further opined that the attack was done for the benefit of and in association with the Norteños, a criminal street gang. Nunez had disrespected the gang by telling Castro that they could not program in the pod. Attacking him showed other prisoners in the pod that the Norteños would not tolerate disrespect. Deputy Moore testified that the classification record showed that defendant was placed in the pod around 1:00 p.m., and the attack occurred between 6:00 and 7:00 p.m., about five to six hours after defendant entered the pod. Nunez told Deputy Moore that the Norteños said they were moving people around for the new guy because he was “ ‘one of us.'"
Verdicts and Sentencing
The jury found defendant guilty as charged on count 2, assault with force likely to produce great bodily injury (victim—Serrano-Gomez), and count 3, active participation in a criminal street gang, and found both gang enhancements true. On count 1 (victim—Nunez), the jury found defendant guilty of the lesser included offense of simple assault.
The trial court subsequently sentenced defendant to the midterm of three years for the aggravated assault conviction on count 2, plus a consecutive three-year term pursuant to the gang enhancement under section 186.22, subdivision (b). The court also sentenced defendant to a concurrent eight-month sentence for the simple assault conviction in count l,[4] and stayed an eight-month sentence (one-third the midterm) for the active participation in criminal street gang conviction in count 3 pursuant to section 654.
*535 DISCUSSION
I. Defendant’s Jail Classification Statements Regarding Gang Membership
A. Additional Background and the Parties’ Contentions
Prior to trial, defendant moved in limine to exclude evidence of his admission that he was a Norteño gang member made during the classification interview to Deputy Charter. The trial court denied the motion, reasoning that this evidence was admissible as an “admission made for purposes of classification before the offense that is alleged in the Information,” falling within the routine booking question exception to Miranda.[5]
Defendant contends the court violated his Fifth Amendment privilege against self-incrimination under Miranda by admitting into evidence his statements to the jail classification officer that he was an active Norteño gang member. He contends that the California Supreme Court’s opinion in Elizalde, supra, 61 Cal.4th 523 “squarely holds that the Miranda exception for routine booking questions does not apply to questions about gang affiliation; that is, that defendants’ responses to such questions may not be introduced into evidence in the prosecution’s case-in-chief if the defendant was not admonished, as described in Miranda, before the question was asked.”[6] He further argues that Elizalde stands for the proposition that all un-Mirandized responses to booking questions about gang affiliation are inadmissible in the prosecution’s case-in-chief, regardless of what offense is charged.
The People contend that the instant case is distinguishable from Elizalde because, unlike the defendant in that case, at the time of the classification questioning here, defendant was not charged with an offense frequently committed for the benefit of criminal street gangs but rather, he was in custody on an immigration hold. The People further contend that “the critical question [under Elizalde] is whether Deputy Charter should have known that his booking question about gang affiliation would have elicited an incriminating response from [defendant] under the circumstances of this case.” The People reason that because gang membership is not in and of itself a crime, and because defendant was not charged with any crime at the time of the booking question, “it cannot be said that Deputy Charter should have known that it was reasonably likely his inquiry would have elicited an incriminating response from [defendant]. To hold otherwise would be unsound, for it would require law enforcement to anticipate any and all future criminal conduct that *536 may or may not be committed by people they question about gang affiliation during the booking process.” Finally, the People contend that even if we conclude that the trial court erred in admitting this evidence, any error is harmless because there was ample other evidence in the record of defendant’s gang affiliation.
B. Analysis
1. Innis Interrogation
Under Miranda, ‘“the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.” (Miranda, supra, 384 U.S. at p. 444.) An individual is subjected to ‘“custodial interrogation” whenever law enforcement officers initiate questioning after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. (Ibid.) The term “interrogation” under Miranda refers not only to express questioning, but also to the “ ‘functional equivalent’ ” of express questioning. (Innis, supra, 446 U.S. at pp. 300-301.) The court in Innis defined the functional equivalent of express questioning as “any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.” (Id. at p. 301.)
Under the booking exception, no Miranda warnings need to be given prior to police communications that are “normally attendant to arrest and custody.” (Pennsylvania v. Muniz (1990) 496 U.S. 582, 600-601 [110 L.Ed.2d 528, 551, 110 S.Ct. 2638] (plur. opn. of Brennan, J.) (Muniz); Innis, supra, 446 U.S. at p. 301; see People v. Andreasen (2013) 214 Cal.App.4th 70, 87 [153 Cal.Rptr.3d 641].) These are communications associated with police administrative duties that are distinct from investigatory duties (Andreasen, at p. 87) and include such inquiries as questions concerning biographical information (People v. Williams (2013) 56 Cal.4th 165, 187 [152 Cal.Rptr.3d 778, 294 P.3d 1005], citing Muniz, at p. 601 (plur. opn. of Brennan, J.)).
In Elizalde, our high court addressed the question of “whether routine questions about gang affiliation, posed to [a] defendant while processing him into jail on murder charges, come within Miranda’s well-recognized booking exception.” (Elizalde, supra, 61 Cal.4th at p. 527.) Our Supreme Court held, “Gang affiliation questions do not conform to the narrow exception contemplated in Innis and Muniz for basic identifying biographical data necessary for booking or pretrial services. Instead, they must be measured under the general Innis test, which defines as ‘interrogation’ questions the police should *537 know are ‘reasonably likely to elicit an incriminating response.’ ” (Elizalde, at p. 538.) The court further held that under the circumstances in Elizalde, the gang affiliation questions were reasonably likely to elicit an incriminating response given California’s criminal gang statutes and the defendant’s pending charges. (Id. at pp. 538-540.) The Elizalde court observed that the defendant was “asked to disclose whether he was a member or associate of an established criminal street gang whose members have a history of committing violence against rival gangs” and he was charged with murder, “a crime frequently committed for the beneht of criminal street gangs.” (Id. at p. 540.) The court concluded, “Under these circumstances, questions about [the defendant’s] gang affiliation were reasonably likely to elicit an incriminating response potentially exposing [the defendant] to prosecution for the crime of gang participation [citations] and to enhanced punishment [citations]. This likelihood was apparent even if the deputies’ subjective intention was benign.” (Ibid., italics added.)
Elizalde does not, as defendant suggests, hold that all un-Mirandized responses to booking questions about gang affiliation are categorically inadmissible. Rather, the Elizalde court simply held that these questions do not fall within the narrow booking exception and must be analyzed under the Innis test for the functional equivalent of express questioning. (Elizalde, supra, 61 Cal.4th at p. 538.) Accordingly, we must determine whether under the circumstances of this case, the classification deputy should have known defendant’s responses to the gang affiliation questions were reasonably likely to elicit an incriminating response. We conclude that they were not.
As we have noted, the Elizalde court held the booking officer should have known it was reasonably likely the gang affiliation questions would have yielded an incriminating response because the defendant’s gang had previously committed violent crimes against rivals and defendant was charged with murder, a crime frequently committed for the beneht of criminal street gangs. (Elizalde, supra, 61 Cal.4th at p. 540.) Thus, under Elizalde, “[w]hether or not a gang-related inquiry by jail personnel requires a Miranda admonition will depend on the nature of the charges the inmate is facing.” (People v. Leon (2016) 243 Cal.App.4th 1003, 1015 [197 Cal.Rptr.3d 600].) Here, defendant was not yet charged or suspected of any crime—commonly committed for the beneht of gangs or otherwise—as the charged crimes had not yet occurred. Rather, he was in custody on an immigration hold while United States Immigration and Customs Enforcement determined his immigration status. Nothing the Elizalde court wrote suggests its holding should apply to crimes that have not yet been committed at the time of the inquiry, and we decline to extend Miranda and Innis that far.
U.S. v. Solano-Godines (9th Cir. 1997) 120 F.3d 957 (Solano-Godines) provides guidance concerning the applicability of Miranda and *538 Innis to future crimes. In that case, the issue was whether the defendant’s responses to an immigration judge’s questions during a civil deportation proceeding were admissible in a subsequent criminal case involving a crime that occurred after the questioning.[7] (Solano-Godines, at pp. 959-962.) The Ninth Circuit, applying the Innis test, held that the immigration judge’s questions were not reasonably likely to elicit an incriminating response. (Solano-Godines, at p. 961.) The court reasoned that ‘“[t]he immigration judge could not be expected to anticipate that two years later [the defendant] would illegally reenter the United States and that his responses to questions at his civil deportation hearing might incriminate him in a prosecution for this future crime.” (Id. at p. 962; see also Fults v. U.S. (10th Cir. 1968) 395 F.2d 852, 854 [holding that Miranda was not applicable where ‘“the crime was committed some time after [the defendant]’s statement was made”]; State v. Allen (1984) 68 Ore.App. 5 [680 P.2d 997, 999] [reasoning that statements made by an inmate during psychiatric exantinations were not inadmissible under Miranda because ‘“[potential use of the exantinations in a later prosecution for crimes not yet (and, one would hope, not ever) committed was wholly unforeseen”].) The result in Solano-Godines flows naturally from the reasoning in Innis: “'[ S|inee the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. [Fn. omitted.]” (Innis, supra, 446 U.S. at pp. 301-302, first italics added.) Thus, it is only when the incriminating results of police words or conduct are reasonably foreseeable that those words or conduct can be considered interrogation for Miranda purposes.
Consequently, under the circumstances of this case, where defendant was questioned about his gang affiliation before the offense even occurred, we cannot conclude that the classification deputy objectively should have known that his questions were reasonably likely to elicit an incriminating response under the Innis test. To hold that it was reasonably likely the gang affiliation questions here would elicit an incriminating response would be the same as holding it was: (1) reasonably likely that defendant would commit a crime in the future; (2) it was also reasonably likely his responses could be used against him in the prosecution of that future crime; and (3) a reasonable booking officer should have foreseen these inevitable occurrences. In our view, Innis does not apply to such unforeseen occurrences and, consequently, *539 Miranda cannot be extended to require warnings related to crimes that have not yet been committed. Accordingly, we conclude that the trial court properly admitted defendant’s statement that he was a Norteño gang member.
2. Prejudice
Even if the trial court erred in admitting defendant’s gang affiliation statements during booking, the error was not prejudicial. The admission of a defendant’s statements in violation of the Fifth Amendment is reviewed under the beyond a reasonable doubt standard of Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (Chapman). (Elizalde, supra, 61 Cal.4th at p. 542.) To establish that any error in admitting defendant’s statement about his gang affiliation is harmless under Chapman, the People must establish beyond a reasonable doubt that the error did not contribute to the jury’s verdict. (People v. Neal (2003) 31 Cal.4th 63, 86 [1 Cal.Rptr.3d 650, 72 P.3d 280] (Neal).) “ ‘To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.’ ” (Ibid.) This requires that we make a judgment about the significance of the statements to reasonable jurors, when measured against the other evidence considered by the jurors independently of those statements. (Yates v. Evatt (1991) 500 U.S. 391, 403-404 [114 L.Ed.2d 432, 449, 111 S.Ct. 1884] [determining whether an instruction providing for an unconstitutional presumption did not contribute to the verdict calls for “a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption”].)
In Elizalde, our high court held that the erroneous admission of responses to the jail booking questions in that case was harmless beyond a reasonable doubt where the defendant’s gang membership was ‘“amply established by independent and uncontradicted evidence.” (Elizalde, supra, 61 Cal.4th at p. 542.) The evidence in Elizalde consisted of three witnesses who testified that they knew the defendant to be a gang member and the gang expert opined that the defendant was a gang member. (Ibid.)
Before discussing the evidence in the instant case that demonstrates the purported error concerning defendant’s admission about his gang membership was harmless, it is first important to point out that gang membership is not an element of the gang enhancement under section 186.22, subdivision (b). There is no requirement that the defendant be an active or current member of the gang to establish the enhancement under section 186.22, subdivision (b)(1). (People v. Sanchez (2016) 63 Cal.4th 665, 698 [204 Cal.Rptr.3d 102, 374 P.3d 320]; People v. Bragg (2008) 161 Cal.App.4th 1385, *540 1402 [75 Cal.Rptr.3d 200], citing In re Ramon T. (1997) 57 Cal.App.4th 201, 207 [66 Cal.Rptr.2d 816].) Section 186.22, subdivision (b)(1), applies to “any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with” the gang and who acted with the requisite specific intent. (Italics added.) The required intent is ‘“the specific intent to benefit, further, or promote the gang.” (People v. Rodriguez (2012) 55 Cal.4th 1125, 1138 [150 Cal.Rptr.3d 533, 290 P.3d 1143] (Rodriguez).) Gang membership is simply circumstantial evidence establishing that the crime was gang related and a motive for why a defendant may have harbored the ‘“specific intent to promote, further, or assist in any criminal conduct by gang members.” (§ 186.22, subd. (b)(1); see Sanchez, at pp. 698-699.) Here, the evidence establishes beyond a reasonable doubt that the assaults were gang related and that defendant acted with the requisite intent.
Similar to Elizalde, the record contains convincing independent and uncon-tradicted evidence of defendant’s gang membership beyond his admission during booking. While the evidence is different from Elizalde, it is nevertheless uncontradicted and no less convincing. Nunez had identified defendant in a photographic lineup after the incident as ‘“the new guy” for whom the Norteños were making bunk space, and the Norteños identified defendant to Nunez, as “ ‘one of us.’ ” At the trial, Nunez identified defendant during the trial as, at the very least, one of the Norteños who was ‘“involved in the fight.” Serrano-Gomez also identified defendant in a photographic lineup as the new guy who had moved into “B” pod the day of the fight and further identified defendant at trial as one of the people who assaulted him. The other men involved in the attack were all identified by Nunez and Serrano-Gomez as Norteños, and Hernandez and Evans both testified that they were Norteños at the time of the attack.
In addition to the witness testimony and admissions of accomplices Hernandez and Evans, Deputy Moore opined as an expert witness that the other attackers were all validated as active Norteños. Deputy Charter testified that when there is a fight between a Norteño and another prisoner, other Norteños are required to jump in and fight. And as we have noted, defendant was identified as being involved in the fight. Furthermore, without contradiction, Deputy Moore opined that the Norteños would not make room in the pod for a non-Norteño. Additionally, Deputy Moore testified that he based his opinion that defendant was a Norteño not only on defendant’s admission during booking, but also on other factors listed in the Department of Justice’s validation criteria[8] as well as facts related to the case, including Serrano-Gomez’s identification of defendant as one of the people who attacked him; *541 defendant’s arrest[9] with a gang for this gang-related offense; and defendant’s affiliation with the gang based on his having been “identified as the new person in the pod they were trying to make room for.”
Thus, even without defendant’s admission of gang membership, the remaining evidence established beyond a reasonable doubt the elements of the gang enhancement: that defendant was a person convicted of a felony in this case; that the felony was committed for the benefit of or in association with the Norteño gang; and that that defendant had the requisite “specific intent to promote, further, or assist in any criminal conduct by gang members.” (§ 186.22, subd. (b)(1).)
Like the gang enhancement, a defendant need not be a member of the gang to be convicted of active participation in a criminal street gang under section 186.22, subdivision (a). “ ‘A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22(a).’ ” (People v. Johnson (2013) 57 Cal.4th 250, 259 [159 Cal.Rptr.3d 70, 303 P.3d 379]; Rodriguez, supra, 55 Cal.4th at p. 1130.) To prove active participation, it is not necessary to show that the defendant devoted all or a substantial amount of his time to the gang. (Castenada, supra, 23 Cal.4th at pp. 747-752.) Rather, the prosecution need only prove that defendant’s involvement with the gang was “more than nominal or passive.” (Rodriguez, at p. 1130; Castenada, at p. 747.) The evidence showing defendant’s personal involvement in the fight over cell arrangements for him and the other Norteños showed beyond a reasonable doubt that defendant was involved more than nominally or passively without his admission of gang membership to the classification deputy.
Thus, the admission of defendant’s statement to the classification deputy about his gang membership was unimportant in relation to everything else the jury considered on the elements of both the gang enhancement and the gang crime. (Neal, supra, 31 Cal.4th at p. 86.) In fight of the independent and uncontradicted evidence we have discussed, and the inferences drawn there from, we conclude that any error in admitting defendant’s statements to the booking officer that he was an active Norteño gang member was harmless *542 beyond a reasonable doubt. (Chapman, supra, 386 U.S. at p. 24; Elizalde, supra, 61 Cal.4th at p. 542.)
II.-VL*

DISPOSITION
We modify the sentence on count 3, active participation in a criminal street gang, to impose the midterm sentence of two years, and order execution of that sentence stayed pursuant to section 654. The trial court shall amend the abstract of judgment to reflect this modification and send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.
The judgment is otherwise affirmed.
Nicholson, Acting P. J., concurred.

 Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

 Prior to trial, Hernandez pleaded guilty to participation in a criminal street gang and was sentenced to a term of 16 months in state prison. He is not a party to this appeal.

 At trial, the prosecution’s theory was that the assaults were committed for the benefit of or in association with a criminal street gang.

 At the prosecutor’s request, the trial court treated the alternate sentencing provision in section 186.22, subdivision (d), and the 186.22, subdivision (b)(1), enhancement “the same in terms of what they say” and imposed the eight-month sentence on simple assault, a lesser offense to count 1, under subdivision (d) based on the jury’s enhancement finding under subdivision (b).

 Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (Miranda).

 We granted the parties’ request for supplemental briefing after Elizalde was published.

 The responses the defendant gave were to the immigration judge’s questions as to his place of birth, his citizenship, and his prior convictions and deportations. (Solano-Godines, supra, 120 F.3d at p. 960.) After the civil deportation proceedings, the defendant was deported, but later tried to reenter the country using a false name and was charged with illegal reentry following a felony conviction and false representation of United States citizenship. It was in this prosecution that his earlier statements to the immigration judge were admitted in evidence against him. (Ibid.)

 Deputy Moore explained that they validate based on at least two of the 10 criteria.

 While Deputy Moore relied on defendant’s arrest with the gang and his arrest for this gang-related offense as two of the factors supporting his opinion, the fact that he was arrested with other gang members does not seem as compelling in a custodial setting as it might in a noncustodial setting. However, we note that Deputy Moore would have been justified in using defendant’s commission of the charged crime with gang members as one of the factors upon which he based his opinion about defendant’s gang membership. (See People v. Castenada (2000) 23 Cal.4th 743, 752-753 [97 Cal.Rptr.2d 906, 3 P.3d 278] (Castenada) [evidence of defendant’s participation in the charged crimes with other gang members was evidence the court considered in determining the “active participation” element of the gang crime under § 186.22, subd. (a)].)

See footnote, ante, page 527.