DATO, J.
*567 A jury convicted defendant Antwaren Lamont Roberts of attempted murder and related offenses arising out of an incident *705 in which he shot Krystal Sharkey with a handgun. It also found that Roberts committed the crimes for the benefit of a criminal street gang within the meaning of section 186.22 of the Penal Code.[1] In the published portion of this opinion, we address Roberts's contention that the California Supreme Court's recent decision in People v. Elizalde (2015) 61 Cal.4th 523, 189 Cal.Rptr.3d 518, 351 P.3d 1010 ( Elizalde ) precludes the admission of certain un-Mirandized[2] statements Roberts made during custodial booking interviews in which he admitted gang membership. Although these interviews occurred years before the crimes with which Roberts is now charged, when he was under arrest for other crimes, we conclude that a Miranda violation does not evaporate with the passage of time such that the statements become cleansed and admissible *568 as to future misdeeds. Accordingly, we reverse the jury's findings as to the gang enhancement. In all other respects we affirm the judgment after addressing Roberts's additional contentions in the unpublished portion of the opinion.
I
FACTUAL AND PROCEDURAL BACKGROUND
Roberts was convicted of attempted murder in violation of sections 664 and 187, assault with a semiautomatic firearm in violation of section 245, subdivision (b), and possession of a firearm by a felon in violation of section 29800, subdivision (a)(1). As to all three counts, the jury found true the allegations that Roberts committed the crime with the intent to promote, further or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1). The jury found his commission of the attempted murder was willful, deliberate, and premeditated within the meaning of section 189, and that he used a firearm, proximately causing great bodily injury to the victim, within the meaning of section 12022.53, subdivision (d). The jury also found Roberts personally used a firearm within the meaning of section 12022.5, subdivision (a), and personally inflicted great bodily harm upon the victim within the meaning of section 12022.7, subdivision (a), in connection with the assault with a semiautomatic firearm. The trial court sentenced Roberts to a determinate term of five years in state prison and a consecutive term of 40 years to life.
A. The Shooting
Sharkey, who had ties to the West Coast Crips (WCC) street gang, was playing dice in downtown San Diego when Roberts, known as "Scrappy," shot her twice in the chest. In addition to Sharkey's trial identification of Roberts as the shooter, Sharkey also told a police officer immediately after the shooting (while at a hospital prior to surgery) that "Scrappy" shot her.
Laticia Nelson was standing with the group of dice players when Sharkey arrived and joined the dice game. Nelson testified Roberts approached the group of dice players and stood with the group for a while. Roberts, who Nelson knew but not very well, briefly spoke to Nelson and then pulled a gun from his pocket and shot Sharkey. In addition to her trial identification of Roberts as the shooter, Nelson was shown some photographs by a police *569 officer within an hour after the shooting and identified Roberts's photograph, telling the officer she was 100 percent sure Roberts *706 was the shooter.[3]
A third witness saw Roberts run from the scene just after the shooting and jump into a white car or truck. A fourth witness, a security guard, could not identify the shooter but saw a black male flee from the scene and get into a white pickup truck.
B. The Alleged Motive
One month before Sharkey was shot, police were investigating the murder of Chyrene Borgen. Roberts and Borgen had been involved in a romantic relationship that Borgen was working to terminate. Sharkey, a friend of Borgen's, believed Roberts was involved with Borgen's murder.
Sharkey was at Borgen's residence on November 1, 2013, when police arrived to notify Borgen's family of her death. At that time Sharkey met Detective Lee Norton, the investigating detective. Norton worked to foster trust with Sharkey, and about 10 days later Sharkey "reached out" to police with information about Borgen's murder
During that same time frame, Sharkey encountered Roberts at a memorial for Borgen. Roberts warned Sharkey that two other WCC members were out to get her. However, Sharkey had a developing suspicion Roberts was involved in Borgen's murder and told Borgen's sister of her suspicion. A few days before Borgen's funeral, Sharkey again encountered Roberts. Roberts angrily told Sharkey he had heard that Sharkey had accused him of being the last person to see Borgen alive. Sharkey claimed that Roberts pointed a gun at her face and said something to the effect of, "[k]eep my name out of your mouth." Roberts's act of pointing the gun at her infuriated Sharkey, who felt extremely disrespected by the act.
Sharkey subsequently saw Roberts at Borgen's funeral on November 18, 2013. Sharkey stared at Roberts during the funeral, and Roberts angrily returned the stare, mouthing the words, "I'm going to kill you." This further infuriated Sharkey, who again perceived Roberts's actions as disrespectful.
On learning that Roberts would be at a kind of wake attended primarily by WCC members, Sharkey decided to go and confront him about his threats to *570 her. When Roberts came in and began laughing and socializing, Sharkey walked up and hit him in the face with a chain. Roberts was enraged. He pulled out a gun and told Sharkey he was going to kill her, and he ultimately left without further incident.
Sharkey believed Roberts would seek revenge. "[H]e wanted his get back from me hitting him with that chain." Sharkey was shot approximately two weeks later.
C. The Gang Evidence
The prosecution's gang expert on the WCC, San Diego Police Department Detective Juan Cisneros, had never heard of Roberts being a member or associate in WCC prior to Borgen's murder, but nevertheless opined Roberts was a member of the WCC gang.[4] Cisneros apparently *707 based his opinion on several indicia. First, after a defense in limine motion was overruled, Cisneros testified that Roberts admitted his association with WCC during jailhouse intake interviews in 2004 and 2006. Second, Cisneros noted several photographs depicting Roberts in the company of gang members. Third, Cisneros observed that Roberts had a nickname. Finally, Cisneros relied on the fact that, while in jail in February 2014, Roberts participated with another alleged WCC member in assaulting a fellow inmate (also an alleged WCC member) for whom Cisneros testified a "green light ... to be assaulted" had allegedly been authorized.
Cisneros also testified that if a WCC member were disrespected in front of other WCC members, the disrespected and humiliated member would have no choice but to retaliate violently, because failure to retaliate would equate to a complete loss of respect and status in the gang and could also lead to rival gang members targeting the disrespected gang member. Given a hypothetical composed of facts mirroring the evidence elicited in this case (including the snitching and chain assault), Cisneros opined the disrespected gang member's act of shooting the person who had disrespected him would benefit the WCC gang.
D. The Defense
The defense maintained Roberts wasn't present at the shooting. Although a witness saw Roberts riding the trolley in the vicinity of the shooting around *571 6:00 p.m. on the night of the shooting, and the shooting occurred about 6:15 p.m., Raheem Jackson (who had known Roberts for about 20 years and thought of him as a "nephew") testified Roberts was at Jackson's house some distance from the shooting site for about two hours, from about 5:00 p.m. to 7:00 p.m. Jackson also testified that Roberts then used Jackson's cell phone to call for a ride, and cell phone records confirmed Jackson's phone was used to call Dwayne Shepard, a pastor, at 7:19 p.m. Pastor Shepard then picked up Roberts at Jackson's house and they went to the movies.
The defense portrayed Sharkey as a vengeful person. She claimed Roberts had tried to rape her 13 years earlier, and she wanted police to go after Roberts for the murder of Borgen. The defense theory of the case was that once Sharkey told police Roberts shot her, they never considered the possibility of other suspects. Defense counsel also argued that even if Roberts was the shooter, the shooting involved an incident of personal revenge rather than being gang related.
II
DISCUSSION
A.-C.**
D. Admission of Gang Evidence
Roberts challenges the jury's true findings on the allegations that all three offenses were committed for the benefit of a street gang and with the intent to promote, further, or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1). He asserts the court erroneously admitted certain evidence of his affiliation with the WCC to prove the enhancement, and that such evidentiary error cannot be deemed harmless beyond a reasonable doubt.
*708 Cisneros opined that Roberts was a member of the WCC gang,[16] basing his opinion on several indicia. First, over defense objection Cisneros testified he relied on Roberts's admissions (during jailhouse intake interviews in 2004 and 2006) that he was a WCC member. Second, Cisneros testified he found *572 two photographs, apparently posted to a Facebook account around the time that people in Roberts's neighborhood had been visiting a memorial site for Borgen, which depicted Roberts at Borgen's memorial site in the company of WCC members. Third, Cisneros relied on the fact Roberts had a nickname. Finally, Cisneros considered a video he had seen in which Roberts participated with another person (a purported WCC member) in assaulting a fellow inmate (also an alleged WCC member) for whom a "green light" had been purportedly been authorized.
To prove the gang enhancement pursuant to section 186.22, subdivision (b)(1), the prosecution must demonstrate that the underlying felonies (1) were committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. ( People v. Ramirez (2016) 244 Cal.App.4th 800, 818, 198 Cal.Rptr.3d 318.) The prosecution need not show that the defendant is an active or current member of the gang. ( In re Ramon T. (1997) 57 Cal.App.4th 201, 207, 66 Cal.Rptr.2d 816.) Certainly, "gang membership is not an element of the gang enhancement [citation], [but] evidence of defendant's membership [can] bolster [ ] the prosecution's theory that he acted with intent to benefit his gang, an element it was required to prove." ( People v. Sanchez (2016) 63 Cal.4th 665, 698-699, 204 Cal.Rptr.3d 102, 374 P.3d 320 ( Sanchez ).)
Cisneros's conclusion that Roberts was a member of the WCC served as the springboard for his opinion that shooting the person who had disrespected Roberts (by "snitching" or by assaulting him with a chain) would benefit the WCC gang and for the prosecution's argument that Roberts's motives for shooting Sharkey were gang related. A primary evidentiary basis for this conclusion was that Roberts admitted he was a WCC member during jailhouse intake interviews in 2004 and 2006.[17] However, our Supreme Court *573 recently concluded in *709 Elizalde, supra, 61 Cal.4th 523, 189 Cal.Rptr.3d 518, 351 P.3d 1010 that use of a defendant's response to routine questions about gang affiliation during jailhouse intake interviews violated a defendant's Fifth Amendment privilege against self-incrimination.[18] ( Id . at pp. 536-540, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) Accordingly, we must assess whether the court's ruling on Roberts's motion in limine was erroneous under Elizalde and, if so, whether the error was prejudicial.
In Elizalde , after recognizing that Miranda protections apply to questions posed to a defendant during the booking process, our Supreme Court considered whether routine inquiries about gang affiliation posed to a defendant while he was being processed into jail fell within the so-called "booking exception" to Miranda as articulated in Pennsylvania v. Muniz (1990) 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 ( Muniz ). ( Elizalde, supra, 61 Cal.4th at p. 533, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) Elizalde noted that, under Muniz , no Miranda warnings are required "for a limited category of booking questions involving biographical data" and admission of a defendant's answers at trial to that limited category does not violate the Fifth Amendment. ( Id . at p. 531, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) However, "[f]or questions outside this limited category, ... answers given, without an admonition, to questions an officer should know are reasonably likely to elicit an incriminating response may not be admitted in the prosecution's case-in-chief." ( Id . at pp. 531-532, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) Elizalde extensively examined Muniz , a plurality opinion in which the United States Supreme Court recognized "a 'routine booking question' exception which exempts from Miranda 's coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' [Citation.]" ( Muniz, at p. 601, 110 S.Ct. 2638 (plur. opn. of Brennan, J.).) Muniz explicitly cautioned that its recognition of a " ' "booking exception" ' " to Miranda " 'does not mean ... that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's Miranda rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.' [Citations.]" ( Id . at p. 602, fn. 14, 110 S.Ct. 2638 (plur. opn. of Brennan, J.).)
Prior to Elizalde , inquiries about gang affiliation had been found to fall within the scope of the booking question exception. In *574 People v. Gomez (2011) 192 Cal.App.4th 609, 121 Cal.Rptr.3d 475, the court interpreted Muniz as adopting a subjective test because Muniz 's language "suggests that the intent of the interrogating officer is more important in evaluating the applicability of the booking question exception than in establishing interrogation generally" ( id . at p. 629, 121 Cal.Rptr.3d 475 ), and therefore the determination of whether a question falls within the booking question *710 required "scrutin[y of] the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information" ( id . at p. 630, 121 Cal.Rptr.3d 475 ). Gomez sought to identify numerous factors for divining the subjective purpose of the interrogation. ( Id . at pp. 630-631, 121 Cal.Rptr.3d 475.)
Elizalde disapproved Gomez 's approach to determining whether routine questions about gang affiliation during jailhouse intake interviews fell within the booking exception. ( Elizalde, supra, 61 Cal.4th at p. 538, fn. 9, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) It explained that Muniz "did not purport to overrule the objective standard articulated in [ Rhode Island v. ] Innis [ (1980) 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 ] for custodial interrogation in general. On the contrary, it reaffirmed Innis 's definition of interrogation. ( Muniz, [supra, 496 U.S.] at pp. 600-601 [110 S.Ct. 2638] [ (plur. opn. of Brennan, J.) ].) In Innis , the court concluded that '[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect ... amounts to interrogation.' ( [Quoting] Innis, at p. 301 [100 S.Ct. 1682], italics added.) The design or intent of the police is relevant to the extent it demonstrates what the police should have known about the nature of the questioning. [Citation.] Nevertheless, it is not a necessary showing; the test is objective, as the high court has recently observed." ( Elizalde, at pp. 536-537, 189 Cal.Rptr.3d 518, 351 P.3d 1010.)
Although it declined to delineate the precise scope of the booking exception in all circumstances, Elizalde concluded that "questions about gang affiliation exceed it." ( Elizalde, supra, 61 Cal.4th at p. 535, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) The court reasoned that gang affiliation questions certainly did not conform to the narrow exception contemplated by Muniz for basic identifying biographical data which involved "questioning ... generally unrelated to crime and unlikely to elicit an incriminating response." ( Ibid . ) Instead, the questioning had to be assessed under the Innis definition of " 'interrogation' " as "questions the police should know are 'reasonably likely to elicit an incriminating response.' [Citation.]" ( Id . at p. 538, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) Applying that test in California, which provides a comprehensive scheme of penal statutes aimed at eliminating criminal activity by street gangs and for which substantial punishment could result, Elizalde concluded that posing gang affiliation questions to a defendant were reasonably likely to elicit an incriminating response "even if the deputies' subjective intention was benign." ( Id . at p. 540, 189 Cal.Rptr.3d 518, 351 P.3d 1010.)
In light of Elizalde , several courts held that un-Mirandized responses to jailhouse intake questions about gang affiliation could not be used by the *575 prosecution in its case-in-chief to prove a gang enhancement. ( Leon, supra, 243 Cal.App.4th at pp. 1015-1016, 197 Cal.Rptr.3d 600 ; Lara, supra, 9 Cal.App.5th at pp. 335-337, 215 Cal.Rptr.3d 91 ; United States v. Williams (9th Cir. 2016) 842 F.3d 1143, 1148-1150.) As in Elizalde , however, each of those cases involved a defendant who was in custody following an arrest for a crime that ultimately served as the basis for the gang enhancement. The responses to the questions asked of the defendant during the booking interview were offered to prove the enhancement. Here, in contrast, Roberts was arrested years earlier for offenses completely unrelated to the charge that now forms the basis for the gang enhancement.
Only one post- Elizalde decision has permitted the admission of a defendant's un- *711 Mirandized responses to gang affiliation questions during a jailhouse intake interview. In Villa-Gomez, supra, 9 Cal.App.5th 527, 215 Cal.Rptr.3d 161, the court faced an unusual fact pattern. A defendant in custody on a federal immigration hold was asked questions about his gang membership. No Miranda warning was given. After the interview, but while he was still in custody on the immigration hold, defendant was involved in a jail fight. He was then arrested and charged with assault and a gang enhancement. ( Id. at pp. 531-533, 215 Cal.Rptr.3d 161.) The Villa-Gomez court concluded that when a defendant is taken into custody and subjected to un-Mirandized questioning but is "not yet charged or suspected of any crime-commonly committed for the benefit of gangs or otherwise ... [n]othing the Elizalde court wrote suggests its holding should apply ...." ( Id . at p. 537, 215 Cal.Rptr.3d 161.)
If Villa-Gomez were limited to the unusual circumstances of the case-a defendant in custody but not suspected of any crime-it would barely detain us here. But the opinion appears to endorse a much broader proposition, suggesting that if "the crime for which defendant was prosecuted had not yet been committed at the time he answered the classification deputy's questions, those questions were not reasonably likely to elicit an incriminating response." ( Villa-Gomez, supra, 9 Cal.App.5th at p. 530, 215 Cal.Rptr.3d 161.) Seizing on this sweeping language, the Attorney General argues that Elizalde "should [not] apply to crimes that have not yet been committed at the time of the inquiry."[19] ( Villa-Gomez, at p. 537, 215 Cal.Rptr.3d 161.) Nothing in Elizalde supports such a broad exception to the general rule that un-Mirandized answers to gang affiliation questions during booking interviews are inadmissible.
Elizalde instructs that the court must evaluate gang affiliation questions in the same way it would analyze any other inquiry pursued without the benefit *576 of a Miranda admonition and determine whether the questions "were reasonably likely to elicit an incriminating response." ( Elizalde, supra, 61 Cal.4th at p. 538, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) The primary factor in making this determination is California's "comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs" by imposing enhancements for gang-related crimes. ( Ibid. ) The Supreme Court then noted that the defendant "was charged with murder, a crime frequently committed for the benefit of criminal street gangs." ( Id. at p. 540, 189 Cal.Rptr.3d 518, 351 P.3d 1010.)
It is not entirely clear whether the Supreme Court intended that the crime with which the defendant is charged at the time the gang membership statements are made be part of the analysis, or merely an illustration of the statements' incriminatory nature. Given the "comprehensive scheme of penal statutes," ( Elizalde, supra , 61 Cal.4th at p. 538, 189 Cal.Rptr.3d 518, 351 P.3d 1010 ), an admission of gang membership always carries with it the incriminatory prospect of future enhanced punishment.[20] But even if it was meant to *712 be a subsidiary factor in the analysis, and unlike the defendant in Villa-Gomez who was "not yet charged or suspected of any crime" ( Villa-Gomez, supra , 9 Cal.App.5th at p. 537, 215 Cal.Rptr.3d 161 ), Roberts was under arrest when he was questioned by intake deputies both in 2004 and 2006.[21] Accordingly, we conclude the jailhouse intake gang-related questioning that followed those arrests was "reasonably likely to elicit an incriminating response." ( Elizalde, supra, 61 Cal.4th at p. 538, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) In the absence of a Miranda warning, Roberts's responses to those questions could not later be used against him.
Because we conclude the evidence regarding Roberts's 2004 and 2006 admissions was improperly admitted at trial, we must assess whether the error was prejudicial. Ordinarily, the erroneous admission of evidence is reviewed for prejudice under the standard described in People v. Watson (1956) 46 Cal.2d 818, 299 P.2d 243, which requires reversal only if the defense shows it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. ( People v. Wilkins (2013) 56 Cal.4th 333, 351, 153 Cal.Rptr.3d 519, 295 P.3d 903.) However, when *577 the error involves a defendant's federal constitutional rights, such as a violation of the privilege against self-incrimination, the error is reviewed for prejudice under the standard described in Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705. Under that test, the prosecution must prove beyond a reasonable doubt that the erroneous admission of Roberts's jailhouse intake statements did not contribute to the guilty verdict. ( Elizalde, supra, 61 Cal.4th at p. 542, 189 Cal.Rptr.3d 518, 351 P.3d 1010.) " 'To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " ( People v. Neal (2003) 31 Cal.4th 63, 86, 1 Cal.Rptr.3d 650, 72 P.3d 280.) This requires that we make a judgment about the significance of the statements to reasonable jurors, when measured against the other evidence considered by the jurors independently of those statements. ( Yates v. Evatt (1991) 500 U.S. 391, 403-404, 111 S.Ct. 1884, 114 L.Ed.2d 432 [determining whether an instruction providing for an unconstitutional presumption did not contribute to the verdict calls for "a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption"], disapproved on other grounds Estelle v. McGuire (1991) 502 U.S. 62, 72, fn. 4, 112 S.Ct. 475, 116 L.Ed.2d 385.)
We cannot conclude the erroneously admitted jailhouse intake statements were harmless beyond a reasonable doubt.
*713 We first note that the statements were a form of confession to a critical element. Our Supreme Court recognized in People v. Cahill (1993) 5 Cal.4th 478, 20 Cal.Rptr.2d 582, 853 P.2d 1037"that confessions, 'as a class,' '[a]lmost invariably' will provide persuasive evidence of a defendant's guilt [citation], that such confessions often operate 'as a kind of evidentiary bombshell which shatters the defense' [citation], [and therefore] that the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial ...." ( Id . at p. 503, 20 Cal.Rptr.2d 582, 853 P.2d 1037.)
Thus, we must "make a judgment about the significance of [the confession] to reasonable jurors, when measured against the other evidence considered by those jurors independently of [the confession]." ( Yates v. Evatt, supra, 500 U.S. at p. 404, 111 S.Ct. 1884.) Here, the "other" indicia of Roberts's affiliation with the WCC was at best both weak and equivocal. The first indicia-that Roberts had a nickname-is unremarkable, particularly when viewed through the prism of Cisneros's concession Roberts had no other indicia of gang association, such as gang tattoos or involvement in placing gang graffiti in WCC territory. The second indicia-that Roberts attended a memorial honoring his deceased girlfriend at which he was photographed with three WCC members *578 who had grown up in the same neighborhood-is both marginal and equivocal evidence in buttressing Cisneros's opinion of his gang membership.[22] Indeed, Cisneros admitted that although he spent 18 months as a gang detective assigned to monitoring just the WCC and had (prior to that time) been assigned to areas involving extensive contacts with the WCC, Roberts had never come to his attention as a WCC member until just a few weeks before the Sharkey shooting. Even then, Roberts only came "across [his] radar" because Roberts attended the memorial and Cisneros saw the two Facebook photos of Roberts in the company of WCC members at that memorial. The final indicia-the fact Roberts participated in a jailhouse fight allegedly involving WCC members-certainly provided some evidence that he associated with WCC members, but there was no evidence that the fight was definitively gang related rather than being motivated by personal animus.[23] *714 We also note that the People cite no evidence about how the crime was committed to suggest that Roberts assaulted Sharkey for the benefit of, at the direction of, or in association with the WCC. Instead, the evidence appears to show Roberts acted alone in the assault, said nothing during the incident to indicate he was acting on behalf of the gang, and was apparently not clothed in attire associated with the WCC. Moreover, the evidence of Roberts's motive for the attack was at least equally susceptible to the interpretation that Roberts was motivated by his personal animus toward Sharkey, arising both from her accusations against him in Borgen's murder and her assault on him with the chain. *579 On this record, the only evidence supporting the gang enhancements was Cisneros's opinion that Roberts, as a WCC member , was animated by gang mores and interests to attack Sharkey. We conclude the prosecution has not demonstrated the other evidence of Roberts's WCC membership was so compelling or uncontradicted that we can be satisfied beyond a reasonable doubt that the erroneous admission of Roberts's confession that he was a WCC member did not contribute to the jury's true finding on the section 186.22, subdivision (b)(1) enhancements.[24] ( Sanchez, supra , 63 Cal.4th at pp. 698-699, 204 Cal.Rptr.3d 102, 374 P.3d 320 [error on gang affiliation evidence not harmless beyond a reasonable doubt]; cf. Elizalde, supra, 61 Cal.4th at p. 542, 189 Cal.Rptr.3d 518, 351 P.3d 1010 [error harmless under Chapman where multiple uncontroverted witnesses testified to defendant's gang membership and detective testified to multiple manifestations of allegiance to gang by defendant].)
DISPOSITION
The true findings on the Penal Code section 186.22, subdivision (b)(1) enhancements are reversed. The judgment of conviction is otherwise affirmed. The matter is remanded to the trial court, where the People shall have 60 days from the date of the remittitur in which to file an election to retry defendant on the reversed gang enhancements. Following retrial, or if the People elect not to retry the enhancements, the trial court shall resentence defendant and prepare an amended abstract of judgment consistent with this disposition and send the amended abstract to the Department of Corrections and Rehabilitation. (See Lara, supra, 9 Cal.App.5th at p. 338, 215 Cal.Rptr.3d 91.)
WE CONCUR:
McCONNELL, P.J.
AARON, J.

All further statutory references are to the Penal Code unless otherwise noted.

See Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (Miranda ).

A nearby security guard, Leroy Bontrager, testified he heard shots fired and then saw a fleeing man get into a white pickup truck and drive away. The man was tucking something into his waistband as he fled. Another percipient witness, Janet Scott, told police she had seen Sharkey and "Scrappy" with the dice players. She was around the corner from the dice players when she heard two or three shots. Scott then saw Roberts running around the corner, with his hands in his pockets, and jump into a white car or truck, which then drove away.

Cisneros also testified as to the history and structure of the WCC, and discussed the importance to criminal street gangs of, among other things, respect, violence, retaliation, fear, snitching, initiation, monikers, and hand signs. He testified that WCC's primary activities include murder, attempted murder, robbery, narcotics sales, and witness intimidation, and provided information as to the three predicate crimes.

See footnote *, ante.

Cisneros also opined (1) the WCC qualified as a criminal street gang; and (2) crimes like those committed by Roberts would benefit a street gang. On appeal, Roberts does not contest the propriety of those opinions, but instead attacks the propriety of Cisneros's opinion that Roberts was affiliated with the WCC.

Cisneros also suggested there may have been two other times Roberts allegedly admitted his association with the WCC. He briefly adverted to a 2002 "documentation card" but the record contains no further information illuminating the genesis of that card, much less what the "card" contained or signified. Cisneros also mentioned an incident in which Roberts was arrested for a battery and, at some undefined time surrounding that arrest, admitted he was a WCC member. Although Cisneros testified that this latter incident occurred in 2001, Roberts's record contains no mention of a 2001 arrest. Even assuming Cisneros was referring to some arrest other than the 2004 and 2006 arrests, the same analysis applicable to the admissions he made in connection with his 2004 and 2006 arrests would appear to apply with equal force to Roberts's admission in connection with any 2001 arrest. Moreover, permitting Cisneros to refer to and rely on these two other "admissions" would also appear to run afoul of our Supreme Court's recent decision in Sanchez (see discussion, post, at fn. 22), and therefore our analysis of the prejudicial impact of the error in admitting Roberts's jailhouse intake statements proceeds from the assumption that references to these other two "admissions" were also improper.

Roberts's opening brief relied on Elizalde in arguing the court erred when it overruled his motion in limine to exclude those admissions. The People initially presented no argument that Elizalde was in any way distinguishable. However, this court requested supplemental briefing on what evidence in the record, if any, revealed the circumstances surrounding appellant's 2004 and 2006 responses to the jailhouse intake questions and, in light of those circumstances, what impact does Elizalde , as well as subsequent cases applying Elizalde, including People v. Leon (2016) 243 Cal.App.4th 1003, 197 Cal.Rptr.3d 600 (Leon ), People v. Lara (2017) 9 Cal.App.5th 296, 215 Cal.Rptr.3d 91 (Lara ), and People v. Villa-Gomez (2017) 9 Cal.App.5th 527, 215 Cal.Rptr.3d 161 (Villa-Gomez ), have upon Roberts's claim that his 2004 and 2006 responses to the jailhouse intake questions were erroneously admitted into evidence. The parties have responded and our evaluation is informed by their responses.

A defendant's statement obtained in violation of Miranda cannot be used as part of the prosecution's case-in-chief. The People cite no authority (other than Villa-Gomez ) for the proposition that an admission which would otherwise be inadmissible under Miranda had it been offered against the defendant in connection with the original arrest becomes admissible after the passage of sufficient time.

The California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.) was first enacted in 1988. (See Stats. 1988, ch. 1256, § 1.) Here Roberts's admissions of gang ties occurred long after there were significant penal consequences associated with gang membership. We have no occasion to comment on whether use of similar statements made before 1988 would violate Miranda.

The 2004 intake interview apparently arose after Roberts was arrested because law enforcement officers had intervened in a verbal altercation between Roberts and an unidentified man. Roberts gave officers a false name and fled. In the ensuing chase, one officer suffered injuries including a broken wrist. Roberts was ultimately charged with resisting an officer (Pen. Code, § 148, subd. (a) ) and giving false information to an officer (id., § 148.9, subd. (a) ). The record does not reveal the factual circumstances leading to the 2006 arrest and intake interview, but only reflects that Roberts was ultimately charged with resisting an officer (id., § 148, subd. (a) ) and injuring or tampering with a vehicle or its contents (Veh. Code, § 10852 ).

Cisneros also acknowledged that, while the Facebook photos depicted Roberts in the company of these three individuals who were wearing gang clothing and "making" gang signs, Roberts was apparently not similarly attired nor was he obviously depicted "making" gang signs.

Although we need not decide the issue, the Supreme Court's recent decision in Sanchez, supra, 63 Cal.4th 665, 204 Cal.Rptr.3d 102, 374 P.3d 320, calls into question whether Cisneros's suggestions-that the fight involved an alleged WCC member assaulting another alleged WCC member, and that the motivation for that fight was "there was a green light for [the latter person] to be assaulted...[to] put[ ] him in his place for what he had done"-are even admissible under California law. Both suggestions appear to be rooted in "case-specific" statements, which are arguably inadmissible under the doctrine developed by Crawford v. Washington (2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 and its progeny. Sanchez adopted the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate testimonial hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (Sanchez, at p. 686, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Here, however, even if Cisneros's suggestions were properly admitted, we cannot conclude the erroneous admission of the most damning evidence-Roberts's alleged statements he was a WCC member-was harmless beyond a reasonable doubt.

At the same time, we reject any contention that erroneous receipt of Cisneros's testimony about Roberts previously admitting gang membership somehow mandates reversal of the convictions on the substantive offenses because the gang evidence allowed the prosecution to bootstrap support for an otherwise weak case. There was compelling evidence from multiple sources indicating Roberts was the shooter, and evidence of Roberts's connection to the WCC would have been received even in the absence of his statements in the jailhouse intake interviews.