Filed 6/30/21  P. v. Fields CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRYANT ERIC FIELDS,<br><br>    Defendant and Appellant. | C085659<br><br>(Super. Ct. No. 16FE007858) |

On the morning of April 18, 2016, defendant and his friend Mo arrived at the apartment of defendant's former girlfriend, B.D., who was with her current boyfriend, J.W.  Defendant and J.W. exchanged words.  As J.W. drove off in B.D.'s car, defendant fired 10 shots at J.W. with a .40-caliber handgun, striking B.D.'s car as well as the minivan of another motorist, J.G.  Neither J.W. nor J.G. was hit.  A jury found defendant guilty of attempted murder of J.W., two counts of assault with a semiautomatic firearm, two counts of unlawfully discharging a firearm at an occupied vehicle, and possession of

1

a firearm by a felon. The trial court sentenced defendant to an aggregate term of 51 years.

On appeal, defendant asserts: (1) the trial court erred and violated his rights to due process and a fair trial by admitting B.D.'s testimony that she was worried defendant "was on some sort of manhunt"; (2) the trial court erred and violated his rights to due process and a fair trial by admitting B.D.'s testimony that she did not return to her apartment until "the next day"; (3) the cumulative effect of these errors resulted in prejudice; (4) the trial court imposed an unauthorized sentence by doubling the sentence imposed on the firearm enhancement attached to count four; (5) the matter must be remanded pursuant to Senate Bill No. 620 (Senate Bill 620) for the trial court to exercise its discretion to consider whether to strike one or more of the firearm enhancements; (6) the matter must be remanded pursuant to Senate Bill No. 1393 (Senate Bill 1393) for the trial court to exercise its discretion to consider whether to strike the Penal Code section 667, subdivision (a), "nickel prior" enhancement (statutory section references that follow are to the Penal Code unless otherwise stated); and (7) following the passage of Senate Bill No. 136 (Senate Bill 136), we must strike the section 667.5, subdivision (b), one-year prior prison term enhancement.

We will modify the judgment to strike defendant's section 667.5, subdivision (b), enhancement. We will further vacate the sentence imposed on the firearm enhancement associated with count four and remand the matter for the trial court to exercise its discretion under Senate Bill 620 to strike one or more firearm enhancements, resentence defendant on the firearm enhancement attached to count four if it does not strike that enhancement, and exercise its discretion under Senate Bill 1393 as to strike the five-year section 667, subdivision (a), enhancement. The judgment is otherwise affirmed.

FACTS AND HISTORY OF THE PROCEEDINGS

An amended information charged defendant with attempted murder of J.W. (§§ 664, 187, subd. (a); count one), assault with a semiautomatic firearm (§ 245, subd. (b); counts two & four), unlawfully discharging a firearm at an occupied vehicle (§ 246; counts three & five), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count six). In connection with count one, the information alleged defendant personally discharged a firearm within the meaning of section 12022.53, subdivision (c), and personally used a firearm within the meaning of section 12022.53, subdivision (b). In connection with counts two and four, the information alleged defendant personally used a firearm within the meaning of section 12022.5, subdivisions (a) and (d). The information also alleged defendant had sustained a prior serious felony conviction and was therefore subject to a section 667, subdivision (a), "nickel prior" enhancement and Three Strikes sentencing pursuant to section 667, subdivisions (b) through (i), and further that he had served a prior prison term within the meaning of section 667.5, subdivision (b).

The Prosecution Evidence

In April 2016, B.D. lived with her daughter in an apartment complex in Sacramento. B.D. dated defendant for approximately two months beginning in November 2015. They were no longer dating by April 2016. As of April 2016, B.D. was dating J.W. They had been dating for approximately three weeks.

On the morning of April 18, 2016, B.D. took her daughter to school and returned to her apartment. B.D. and J.W. were in the apartment when there was a knock at the door. Defendant's friend, whom B.D. knew as Mo, was at the door. Defendant was also by the door. J.W. and Mo were both wearing white shirts and defendant was wearing a black shirt. Defendant greeted B.D. J.W. then came out from the bedroom and left the apartment. On the walkway in front of B.D.'s apartment, defendant and J.W. exchanged words. Defendant said, " 'What's up?' " and " 'Who are you?' " to J.W. J.W. then left,

3

taking B.D.'s white Pontiac four-door sedan. B.D. shut her apartment door after J.W. left.

Right after B.D. shut her door, she heard gunshots. She estimated she heard seven shots. Later, J.W. called B.D. and told her that someone shot at him while he was in her car.

J.G. was driving his father-in-law's Toyota minivan when he drove by the apartment complex. He was near an intersection when he heard what sounded like a gunshot, and then another. He looked in his mirror and saw a car directly behind him and someone standing in the street approximately half a block away. The person standing in the street was either black or Hispanic and was wearing a dark colored long-sleeved T-shirt or sweater and jeans. J.G. made a left turn and drove off. As he turned, J.G. heard more gunshots, "probably at least four more." He also heard his car being hit by one of the shots. J.G. drove to his father-in-law's house and called the police. He observed a bullet hole in the minivan near the gas cap.

At approximately 9:45 a.m., law enforcement received a notification from the ShotSpotter program that the sound of gunfire had been detected. Initially, the program reported that 11 rounds were fired, but a subsequent report indicated that 10 rounds had been detected.

After arriving at the location of the shots fired, police found 10 .40-caliber Winchester shell casings. Additionally, police located two vehicles parked in stalls next to each other with damage consistent with gunfire.

Meanwhile, Officer Clayton Whitcomb responded to J.G.'s location and took a statement from him. Whitcomb observed damage to the minivan, including a single bullet hole near the gas cap cover. Whitcomb found a bullet in the trunk of the minivan.

B.D. did not spend that night at her apartment. She also did not call the police to report the shooting. Nor did J.W.

The day after the shooting, Officer David Eagleton responded to the apartment complex and viewed a surveillance video of the shooting. While he was at the apartment complex, at approximately 11:45 p.m., a white Pontiac Bonneville, consistent with the vehicle Eagleton saw in the surveillance video being shot at, pulled into a parking stall. Eagleton approached the Pontiac and contacted the occupants, B.D. and J.W. B.D. gave the officer a statement. Eagleton described her as "cooperative but scared." B.D. told Eagleton that, after previously viewing the surveillance video, she believed defendant was the person who shot at J.W. B.D. showed Eagleton the damage to her vehicle. There was what appeared to be a bullet strike to the windshield, damage to the A-pillar and the dashboard, damage to a rearview mirror, and there were at least two bullet holes in the exterior, including one on the right rear passenger door. J.W. was cooperative and provided a "[v]ery minimal" statement to Eagleton. J.W. did not testify at trial.

B.D. testified that, in the surveillance video, an individual can be seen shooting at B.D.'s vehicle which J.W. was driving. B.D. testified that one of the individuals seen on the video "walking after [J.W.'s] vehicle before the shooting" appeared to be defendant based on the clothing. That person appeared to be shooting towards the vehicle.

Viewing the video during her trial testimony, B.D. identified J.W. based on the shirt he was wearing. As for another individual who walked into the frame, B.D. testified that it appeared to be defendant based on the clothes, height, and weight. On cross-examination, asked if the person in the video was defendant, B.D. responded, "[p]ossibly," and "[i]t could be. I don't know." She acknowledged, however, that she had told police it was defendant. She also acknowledged telling a defense investigator that she "had told the police that it looked like [defendant] because other people had said it was already him." Asked on redirect examination if she told officers, based on the clothing and the timing, that the person on the video appeared to be defendant, B.D. responded, "It could have been, yes." B.D. testified she had never previously seen defendant with a firearm.

5

The surveillance video from the apartment complex, People's exhibit 14, was played for the jury.

Detective Ronald Milton of the Sacramento County Sheriff's Department testified that he contacted defendant's father at a hospital on April 23, 2016, seeking information about defendant's whereabouts. Defendant's father told Milton that defendant had a girlfriend named Honey who lived in Natomas. Defendant's father testified he did not recall telling the officers that defendant stayed with his girlfriend, Honey, he denied telling the officers that Honey was defendant's girlfriend, and he denied telling the officers that Honey lived in Natomas.

Meanwhile, Officer Brandon Hann, who was also looking for defendant, learned of two April 23, 2016, purchases traced to defendant, one at an am/pm store and another at a Raley's supermarket. Hann went to the am/pm location and viewed a recording of the store's surveillance video. On the video, Hann "saw a maroon Buick pull up to pump number 5 and [Hann] identified [defendant] as getting out of the car." There was someone else in the front passenger seat. Using the maroon Buick's license plate, Hann tracked that vehicle to a house in Natomas (the Natomas house).

Detective Milton was conducting surveillance at the Natomas house looking for defendant when he learned defendant was alleged to be in a silver BMW SUV leaving the Natomas house. Milton initiated a vehicle stop, pulling over the silver BMW in which defendant was a backseat passenger. Milton detained defendant.

Hann went to the Natomas house and contacted the renter of the house, Tanisha Ross. According to Hann, Ross told him defendant had spent the night at her house. Ross also told Hann that defendant had clothing and paperwork in her master bedroom.

Police searched Ross's house. In a Jordan shoe box in the master bedroom closet, police found a black Glock model 23 handgun with a 22-round magazine containing 15

rounds and a loose round of Winchester .40-caliber ammunition.[1]  In another bedroom, police found a box of .40-caliber ammunition on a closet shelf.  The box had the capacity to hold 50 rounds, but it only contained 25.  Hann told Ross police had found a firearm and a box of ammunition.  Ross testified that, prior to the police search, she was not aware of the presence of any firearms or ammunition at her house.

Police also found a backpack in the master bedroom closet containing paperwork belonging to defendant.  Asked whose backpack appeared in a photograph, Ross testified that it was hers.  However, she testified that a backpack she owned should not have contained paperwork belonging to defendant.  She also testified, on cross-examination, that several people brought backpacks into her house that day.  Ross testified that 15 to 20 people were at her house that morning preparing for a barbecue, including defendant's mother, who came with defendant.  Hann, however, testified that Ross never told him that 15 to 20 people had been at her house or that people had brought bags to the house.

Ross testified that defendant was friends with her brother.  They were having a barbecue that day for defendant and her brother.  When the police officers came to Ross's house, defendant was at the park around the corner where the barbecue was taking place. Defendant had been at the house earlier.  In her trial testimony, Ross denied defendant had been staying at her house or that he ever spent the night at her house.  Asked whether defendant had personal property at her house, Ross testified:  "When -- everybody got dressed at my house that day prior to the barbecue.  So he had a bag, my brother had a bag, and other friends and family that was there."  She testified that everyone got dressed

---

[1]  The reporter's transcript indicates that police found "a .22 round magazine" containing "only 15 bullets."  Later the magazine was described as an "extended" magazine.  In context, it appears that the "22 round magazine" was a reference to the capacity of the magazine in number of rounds rather than the character of the magazine as being one for .22-caliber bullets.

at her house that day and used the shower in her bedroom because the other bathroom was not working. However, she testified that defendant did not keep or store personal property at her house.

Ross identified in a photograph a red Buick LeSabre as her vehicle. The vehicle was registered under a different name. Asked if that name was Honey Jones, Ross responded, "I don't know what it was registered under when I bought it from the guy who I bought it from, he known me as Honey. So I guess that's what he put it." Ross testified that, in April 2016, around the time the search at her house occurred, her brother was using the vehicle.

Jeremy Zerbe, a criminalist from the Sacramento County District Attorney's Laboratory of Forensic Services, testified as an expert in the field of forensic firearm analysis. Zerbe concluded that the 10 Winchester .40-caliber cartridge casings were all fired using the same firearm, and further that they were all fired from the Glock handgun recovered in this case. As for the single bullet recovered in this case, Zerbe could only say that it could have been fired from the Glock or from another firearm with similar class characteristics.

*Defense Evidence*

Defendant's mother testified that, as of April 2016, she lived in Oakland. On Monday, April 18, 2016, she was at home in Oakland, and she saw defendant that day at her house. On cross-examination, she testified that defendant was with her that day. He had arrived at her home on Sunday afternoon and spent the night. "[H]e was there from Sunday until Wednesday." He was there on Monday morning when she woke up. However, she testified defendant would come and go from the house when he was staying with her. She testified that the only time defendant stayed with her in 2016 was the week of the shooting.

8

Defendant's mother testified that she and her son came to Sacramento from Oakland on Wednesday, two days after the shooting. She acknowledged that, in a statement she gave to a defense investigator, she stated that defendant arrived in Oakland on Sunday, April 17, and that they traveled to Sacramento on Tuesday, April 19, although she testified she "believe[d] it was Wednesday." Defendant's mother testified that, while she spent the intervening nights at Ross's house, defendant did not spend all of those nights there. She testified that there were others who were also staying at Ross's house at the time.

Defendant's mother testified that, on Saturday, April 23, 2016, she was at the Natomas house because "we were planning to have the picnic at the park and we were preparing food and getting things ready. People were showering, changing clothes, getting ready to go to the park." Defendant was there. To her knowledge, defendant was not in a dating relationship with Ross at that time. Defendant's mother testified that she brought the backpack in evidence from her home in Oakland to Sacramento.

*Stipulations*

The parties stipulated that (1) "on April 23, 2016, Sacramento Police Department Officers located a black backpack in the master bedroom closet at [the Natomas house], People's Exhibit No. 13. Inside the backpack they located numerous items of indicia with the defendant's name on them. The items in the backpack included paperwork and notebooks," and (2) defendant had sustained a prior felony conviction on November 19, 2009.

*Verdict and Sentence*

The jury found defendant guilty on all counts and found true each of the firearm enhancement allegations.

Defendant waived jury trial on his prior convictions. The trial court found defendant had sustained a prior serious felony conviction and was therefore subject to a

9

section 667, subdivision (a), "nickel prior" enhancement and Three Strikes sentencing pursuant to section 667, subdivisions (b) through (i), and that he had served a prior prison term within the meaning of section 667.5, subdivision (b).

The trial court sentenced defendant to an aggregate term of 51 years, calculated as follows: the upper term of nine years on count one, attempted murder, the principal term, doubled to 18 years pursuant to sections 667, subdivisions (b) through (i) and 1170.12 for his strike prior plus 20 years for the section 12022.53, subdivision (c), personal discharge of a firearm enhancement attached to count one, the upper term of nine years on count two, assault with a semiautomatic firearm, doubled to 18 years for his strike prior plus 10 years for the section 12022.5, subdivision (a), personal use of a firearm enhancement attached to count two, with the sentences on count two and its enhancement stayed pursuant to section 654, the upper term of seven years on count three, discharging a firearm at an occupied motor vehicle, doubled to 14 years for his strike prior plus 10 years for the section 12022.5, subdivision (a), personal use of a firearm enhancement,[2] with those sentences stayed pursuant to section 654, two years, one-third the midterm, on count four, assault with a semiautomatic firearm, doubled to four years for his strike prior plus one year four months, one third the midterm, on the section 12022.5, subdivision (a), personal use of a firearm enhancement attached to count four, doubled,[3] the upper term of seven years on count five, discharging a firearm at an occupied motor vehicle, doubled to 14 years for his strike prior plus 10 years for the section 12022.5, subdivision (a), personal use of a firearm enhancement attached to count five, with the sentences on count

---

[2] We shall correct the oral pronouncement of judgment to reflect the fact that there was no firearm enhancement attached to count three. This sentence the court purported to impose does not appear in the abstract of judgment.

[3] As we discuss in part IV, the court erred in doubling the enhancement sentence on count four.

five and its enhancement stayed pursuant to section 654, eight months, one-third the midterm, on count six, possession of a firearm by a felon, doubled for his strike prior, and five years for the section 667, subdivision (a), enhancement. The court stayed the one-year term for the prior prison term enhancement. (§ 667.5, subd. (b).)

DISCUSSION

I

*Admission of B.D.'s Testimony Defendant Was on a "Manhunt"*

During B.D.'s testimony, the following exchange occurred concerning events after the shooting:

"Q. And where did you go at that point?

"A. I went to my granny's house.

"Q. Okay. Why didn't you stay at the apartment?

"A. Because I didn't want to.

"Q. Okay. Were you scared?

"[DEFENSE COUNSEL]: Objection. Relevance.

"THE WITNESS: No.

"[DEFENSE COUNSEL]: Withdrawn.

"THE COURT: Overruled.

"Q. BY [THE PROSECUTOR]: Did you tell the officers that you were worried the defendant would come back or that he was on some sort of manhunt, I believe your words were?

"[DEFENSE COUNSEL]: Objection. Relevance. Hearsay.

"THE COURT: One second, please.

"Are you asking this to be admitted for the truth of the matter asserted or state of mind?

"[THE PROSECUTOR]: Both. It's the defendant's statement.

11

"THE COURT:  Overruled.

"THE WITNESS:  Yes."

Defendant asserts the trial court violated his right to due process and a fair trial by admitting B.D.'s testimony that she was worried defendant was on some sort of manhunt. Defendant asserts that the trial court erroneously admitted B.D.'s statement, under the mistaken belief that she was repeating a statement defendant made, for its truth and relevant to defendant's state of mind.  However, B.D. was not recounting a statement defendant had made; "the statement was hers alone."  Defendant asserts the trial court's ruling was based on facts not supported by the record and it cannot represent a valid exercise of the court's discretion.  Inasmuch as it was admitted as B.D.'s statement alone, defendant asserts the testimony was irrelevant hearsay and inadmissible.  Defendant asserts that, because B.D. was the only person whose state of mind was reflected by the statement, and her state of mind was irrelevant, the court should have excluded the testimony.  Nor was the statement admissible as B.D.'s lay opinion concerning defendant's intent because the statement was not based on personal observation.  (See Evid. Code, § 800.)  Further, according to defendant, the statement was more prejudicial than probative, and should have been excluded under Evidence Code section 352.

The Attorney General acknowledges the prosecutor misspoke when she stated, "It's the defendant's statement."  However, the Attorney General asserts that, "[g]iven the impossibility of the statement, i.e., that [defendant] made the statement, and the statement's context, the court would have understood the statement to mean the prosecutor was arguing that [B.D.] was the declarant," not defendant, and that "it is clear the parties understood it as such because the trial court overruled the objection, and defense counsel did not object to the prosecutor's offer of proof."

To the extent the court admitted the statement under the belief that it reflected a statement made by defendant, this was error.  As the parties agree on appeal, the statement was B.D.'s statement alone.  If it was admitted to reflect defendant's state of

12

mind, as an admission made by defendant, or for the truth of the matter as asserted by defendant, the trial court abused its discretion in admitting the statement.

Moreover, on this record, in light of the prosecutor's erroneous representation that it was defendant's statement, we cannot conclusively determine the trial court admitted the statement based on the understanding, advanced by the Attorney General on appeal, that B.D. was the declarant. As such, we shall assume, without deciding, that it was error to admit the statement altogether, and proceed to evaluate whether, assuming it was error to admit the statement, the error was prejudicial to defendant.

Defendant asserts the erroneous admission of this evidence requires reversal of his attempted murder conviction. "Ordinarily, the erroneous admission of evidence is reviewed for prejudice under the standard described in *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)], which requires reversal only if the defense shows it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Roberts* (2017) 13 Cal.App.5th 565, 576.)

Defendant asserts the admission of B.D.'s testimony violated his rights to due process and a fair trial, and therefore prejudice must be evaluated under *Chapman v. California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711] (*Chapman*). Under *Chapman*, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 (*Aledamat*).) Under *Chapman*, the People must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, at p. 24; *Aledamat*, at pp. 12-13.) " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86.) In other words, the *Chapman* harmless error inquiry asks:

" 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*); accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*).)

In the end, we conclude that there is no possibility that any error in the trial court's evidentiary ruling prejudiced defendant, whether harmless error is judged under the state standard for evidentiary rulings, which we believe is applicable here (*Watson, supra*, 46 Cal.2d at p. 836; see *People v. Hovarter* (2008) 44 Cal.4th 983, 1010 [the " 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights' "]), or the more rigorous harmless beyond a reasonable doubt standard of *Chapman, supra*, 386 U.S. at pages 23-24.

On April 18, 2016, immediately prior to the shooting, B.D. was at her apartment with her new boyfriend, J.W. Defendant, who was B.D.'s former boyfriend, and his friend Mo appeared at B.D.'s apartment. J.W. and defendant's friend were both wearing white shirts. Defendant was wearing a black shirt. As J.W. left, he and defendant exchanged words. B.D. shut her apartment door after J.W. left, and then she heard numerous gunshots. Later, J.W. informed B.D. someone shot at him while he was in her car. There were at least two bullet holes in the vehicle.

J.G. was driving his father's minivan when he heard gunshots. He looked in his mirror and saw a car behind him and someone standing in the street. The person standing in the street was either black or Hispanic and was wearing a dark T-shirt or sweater. As he made a turn, J.G. heard more gunshots, "probably at least four more." He also heard his car being struck. There was a bullet hole in the minivan near the gas cap and a bullet was found in the trunk.

Responding to B.D.'s apartment complex following a ShotSpotter program notification of gunfire, law enforcement found 10 .40-caliber Winchester shell casings.

The day after the shooting, B.D. told Officer Eagleton that, after previously viewing the surveillance video, she believed defendant was the person who shot at J.W.

B.D. testified that, in the video, an individual can be seen shooting at her vehicle which J.W. was driving. B.D. testified that one of the individuals seen on the video "walking after [J.W.'s] vehicle before the shooting" appeared to be defendant based on the clothing, height, and weight. That person appeared to be shooting at the vehicle. On cross examination, asked if the person in the video was defendant, B.D. responded, "[p]ossibly," and "[i]t could be. I don't know." However, she also acknowledged that she had told police it was defendant. Asked if she told officers, based on the clothing and the timing, that the person on the video appeared to be defendant, B.D. responded, "It could have been, yes."

The jury viewed the apartment complex surveillance video.

Five days after the shooting, according to Detective Milton, defendant's father told him defendant had a girlfriend, Honey, who lived in Natomas. Officer Hann traced the maroon Buick connected to defendant back to the Natomas house rented by Tanisha Ross, also known by at least some as Honey. Ross testified that, in April 2016, around the time the search at her house occurred, her brother was using her red Buick. Her brother was defendant's friend. Later that day, police arrested defendant after he left the Natomas house in a silver BMW.

Ross told Hann defendant had spent the night at her house and that he had clothing and paperwork in her master bedroom. In the Natomas house, police found a backpack in the master bedroom closet containing paperwork belonging to defendant. In the same closet, in a shoebox, police found a black Glock model 23 handgun with a 22-round magazine containing 15 rounds and a loose round of Winchester .40-caliber ammunition. In another bedroom closet, police found a box of .40-caliber ammunition containing 25 rounds of its 50-round capacity. Ross knew nothing of the gun or ammunition. An expert in forensic firearm analysis testified the Glock fired all of the shell casings recovered from B.D.'s apartment complex, and the bullet found in J.G.'s trunk could have been fired from the Glock.

15

Defendant's alibi witness was his mother, who testified defendant was with her on the morning of the shooting. However, she testified defendant would come and go from the house when he was staying with her.

Defendant's mother also testified that she brought the backpack containing defendant's paperwork from her home in Oakland to Sacramento. However, Ross also testified the backpack was hers. Ross acknowledged that a backpack she owned should not have contained paperwork belonging to defendant.

The prosecutor did not mention the "manhunt" remark in her closing arguments.

The admission of B.D.'s testimony that she told officers she was worried defendant would come back or that he was on some sort of manhunt was harmless beyond a reasonable doubt. Based on this state of the record, it is " 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty' " of attempted murder absent the error, assuming there was any, in admitting this testimony. (*Geier, supra*, 41 Cal.4th at p. 608; accord, *Chapman, supra*, 386 U.S. at pp. 23-24; *Livingston, supra*, 53 Cal.4th at p. 1159.)

## II

*Testimony B.D. Did Not Return to Her Apartment Until "the Next Day"*

Also during B.D.'s direct examination, the following occurred, concerning her actions the night of the shooting:

"Q. BY [THE PROSECUTOR]: And did you return to that complex that night?

"A. No.

"Q. And when was the first time that you went back to that apartment complex?

"[DEFENSE COUNSEL]: Objection. Relevance.

"THE COURT: Overruled.

"THE WITNESS: I believe the next day."

16

Defendant asserts the trial court erred in overruling his objection to B.D.'s testimony that she fled to her "granny's house," as set forth in her testimony quoted in part I, and did not return to her apartment complex until "the next day." According to defendant, the "clear implication was that she was so scared of what [defendant] might do that she could not go back home." Defendant couches this argument, too, in the form of a due process violation. Defendant asserts the court erred in admitting this testimony because it was admitted under the court's mistaken impression defendant stated he was going on some sort of manhunt, it was not relevant to any issue, and it was not admissible under any theory.

The Attorney General notes defendant only objected on relevance grounds. Therefore, the Attorney General asserts defendant forfeited claims premised on any other grounds.

Evidence Code section 353 provides, in pertinent part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." Thus, a " ' "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*).) " 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*Ibid.*)

" 'Evidence Code section 353 does not exalt form over substance.' " (*Partida, supra*, 37 Cal.4th at p. 434.) "The statute does not require any particular form of

17

objection. Rather, 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Id.* at pp. 434-435.)

Defendant did not object to B.D.'s testimony that, after the shooting, she "went to [her] granny's house." Thus, any contention about this testimony is plainly forfeited. (Evid. Code, § 353, subd. (a).)

As for B.D.'s testimony that she went back to her apartment complex "the next day," defendant objected only on relevance grounds. Therefore, he has forfeited any other objection to the admission of the evidence. (Evid. Code, § 353, subd. (a); *Partida, supra*, 37 Cal.4th at pp. 433-435.) Thus, we must determine whether this evidence was relevant. Additionally, "[a] defendant may . . . argue that the asserted error in overruling the trial objection had the legal consequence of violating due process." (*Partida*, at p. 431.)

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

18

B.D. left the apartment complex after the shooting, did not report the shooting to law enforcement, and did not speak to law enforcement until the following day. When she finally did speak to law enforcement, she may have done so only because Officer Eagleton approached her upon seeing her arrive in the white Pontiac Bonneville which appeared consistent with the car seen being shot at in the apartment complex surveillance video. B.D. was "cooperative but scared."

B.D.'s testimony that she did not go back to her apartment complex until "the next day" after the shooting was relevant to her credibility and the reliability of her account of the events leading up to and following the shooting. As such, her testimony had some tendency in reason to prove or disprove disputed facts of consequence to determination of the action. (Evid. Code, § 210.) The trial court properly admitted this rather inconsequential testimony over defendant's relevance objection. Moreover, given our conclusion that the trial court properly admitted this relevant evidence, defendant's contention that the error in admitting irrelevant evidence against him violated his due process and fair trial rights is without merit.[4]

### III

### *Cumulative Error*

Defendant asserts the cumulative effect of the errors addressed in parts I and II violated his right to due process and a fair trial. We disagree. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect may require reversal. (*People v. Bunyard* (1988)

---

[4] Defendant's contention that the trial court erred in admitting this statement because the court's "ruling was made under its mistaken impression that [defendant] had said something about going on a manhunt" is also without merit. Whether or not the court was under that impression, the statement was properly admitted for the reasons stated *ante*.

45 Cal.3d 1189, 1236-1237.) In part I, we concluded that any error was not prejudicial. In part II, we concluded there was no error. As such, there is no cumulative effect of errors to consider. "Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) Defendant was not deprived of a fair trial.

IV

*Unauthorized Sentence*

Defendant asserts the trial court imposed an unauthorized sentence when it doubled the section 12022.5, subdivision (a), enhancement on count four. The Attorney General concedes it was error to double the firearm enhancement on count four, and we agree. "A claim that a sentence is unauthorized may be raised for the first time on appeal, and is subject to correction whenever the error comes to the attention of the reviewing court." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1048, fn. 7.) "[E]nhancements are added after the determination of the base term and are not doubled." (*People v. Sok* (2010) 181 Cal.App.4th 88, 93-94; accord, *People v. Hardy* (1999) 73 Cal.App.4th 1429, 1433 ["In sentencing a defendant who has one prior strike, the court may not double any enhancements it imposes"].) The trial court should have imposed one-third the midterm on this enhancement, 16 months, and not doubled that term. We shall vacate the 32-month sentence imposed on the section 12022.5, subdivision (a), enhancement attached to count four.

V

*Senate Bill 620*

Defendant asserts that, following the enactment of Senate Bill 620, we must remand the matter to afford the trial court the opportunity to exercise its discretion to strike one or more of his firearm enhancements.

20

The Attorney General agrees Senate Bill 620 applies retroactively to defendant's case. However, the Attorney General further asserts remand is not necessary because the record demonstrates the trial court would not have struck or dismissed the firearm enhancements had it the discretion to do so.

On January 1, 2018, Senate Bill 620 became effective. (Stats. 2017, ch. 682, §§ 1-2.) That measure vested courts with authority to exercise their discretion to strike or dismiss firearm enhancements imposed under sections 12022.5 (§ 12022.5, subd. (c)) and 12022.53 (§ 12022.53, subd. (h)). Senate Bill 620 applies retroactively to defendant as it became effective before his case is final. (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.)

Despite the enactment of Senate Bill 620, we need not remand if the "record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; see *People v. Jones* (2019) 32 Cal.App.5th 267, 272-273; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894.) We review the trial court's statements and sentencing decisions to see if the court clearly indicated its intent not to strike the enhancement if it had the discretion to do so.

As the trial court commenced sentencing, it stated: "I want you to know, I don't sentence you lightly. I don't take this lightly. I understand there's a young man seated in front of me, only 24 years of age. I take that seriously. I do. [¶] But with that in mind, I also note from the probation report that the prior conviction that you were on parole for when you committed this offense, that in November 19th of 2009 you did receive a six-year prison sentence for shooting -- or using -- or assault with a firearm and also the enhancement of 12022.5, in that you pulled up and exited your car and fired a handgun several times towards two victims. No one was struck, and the victims ran into the house. The allegation is then you ran away -- or drove away; however, officers quickly spotted your vehicle, and you were arrested and detained with the firearm and 20 pills,

21

looks like, methamphetamine. [¶] You were paroled February 24th of 2015, and approximately, I believe, it was ten months later you're then arrested for this charge on this matter. There's no other way to describe it other than emptying your gun at a vehicle, spraying bullets in broad daylight in the morning throughout a neighborhood, striking cars some distance away, as well as [J.G.'s] vehicle, who was nothing other than a truly innocent victim. [¶] But for one foot one way or another, this would be so easily a homicide trial -- or a homicide conviction, and I don't believe it was for lack of trying. You did empty your gun directly into the vehicle."

In discussing factors in aggravation, the court stated: "the crime did involve great violence, potential great bodily harm, threat of bodily harm or other acts disclosing a high degree of cruelty or viciousness. [¶] The Court will not consider Rule of Court 4.421(a)(2)[5] because of the potential enhancement, although the other circumstances in aggravation points out the defendant was engaged in violent conduct, which indicates a serious danger to society, and the defendant was -- his prior[] convictions as an adult or sustained petitions in juvenile delinquency proceedings that are at least, if not numerous, at least increasing in seriousness, and the defendant was on parole at the time the offense was committed."

The court noted, as a mitigating factor, defendant's youth at the time of the offenses. (See Cal. Rules of Court, rule 4.408.)

In sentencing defendant, the trial court selected the upper terms when imposing full-term sentences.

---

**5** Under California Rules of Court, rule 4.421(a)(2), with regard to circumstances in aggravation, "[f]actors relating to the crime, whether or not charged or chargeable as enhancements include that" "[t]he defendant was armed with or used a weapon at the time of the commission of the crime."

Because it was imposing the section 667, subdivision (a), enhancement, the court stayed the one-year term for the prior prison term enhancement pursuant to section 667.5, subdivision (b). (See *People v. Jones* (1993) 5 Cal.4th 1142.)

We cannot say with certainty the record demonstrates the trial court would not have stricken one or more of the firearm enhancements if it had the discretion to do so. Because, under these circumstances, we cannot determine the trial court's intention, we will remand the matter to allow it to exercise its discretion under Senate Bill 620 and reconsider the enhancements.

## VI

### *Senate Bill 1393*

In supplemental briefing, defendant asserts we must remand the matter so the trial court may determine whether to exercise its discretion pursuant to Senate Bill 1393 to strike the section 667, subdivision (a), five-year enhancement. The Attorney General agrees Senate Bill 1393 applies retroactively to defendant's case.

Senate Bill 1393 (2017-2018 Reg. Sess.) went into effect on January 1, 2019, and amended sections 667, subdivision (a), and 1385, subdivision (b), to give a trial court the authority to strike or dismiss a prior serious felony allegation in the furtherance of justice under section 1385. Because defendant's appeal was pending when Senate Bill 1393 went into effect, it applies to defendant retroactively. (*People v. Franks* (2019) 35 Cal.App.5th 883, 892; *People v. Jones, supra,* 32 Cal.App.5th at pp. 272-273.)

Again, the Attorney General asserts remand is not necessary because the record demonstrates the trial court would not have dismissed the prior serious felony enhancement had it the discretion to do so. For the reasons discussed in part V, we cannot determine the trial court's intention, and therefore we will remand the matter to allow the trial court to exercise its discretion under Senate Bill 1393 and reconsider the section 667, subdivision (a), enhancement.

23

## VII

### *Senate Bill 136*

In a second round of supplemental briefing, defendant asserts the one-year prior prison term enhancement imposed pursuant to section 667.5, subdivision (b), must be stricken pursuant to the amendment to that section by Senate Bill 136. The Attorney General concedes the issue. We agree and modify the judgment accordingly.

Signed by the Governor on October 8, 2019, and effective January 1, 2020, Senate Bill 136 amends section 667.5, subdivision (b), to eliminate the one-year prior prison term enhancement for most prior convictions. (See Sen. Bill No. 136 (2019–2020 Reg. Sess.) § 1.) An exception, not applicable here, is made for a qualifying prior conviction on a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b).

We agree with the parties that, under the principles articulated in *In re Estrada* (1965) 63 Cal.2d 740, the amended law applies to defendant retroactively. (*Id* at pp. 744-745; see, e.g., *People v. Jennings* (2019) 42 Cal.App.5th 664, 681-682.) Defendant's prior prison term no longer qualifies for a one-year sentence enhancement under section 667.5, subdivision (b), as amended by Senate Bill 136. Accordingly, defendant's 667.5 subdivision (b), enhancement must be stricken.

### DISPOSITION

The judgment is modified to strike defendant's 667.5 subdivision (b), enhancement. The oral pronouncement of judgment is modified to vacate the 10-year term imposed and stayed as a section 12022.5, subdivision (a), enhancement sentence attached to count three because there was no such enhancement attached to that count. The sentence imposed on the section 12022.5, subdivision (a), enhancement attached to count four is vacated. The matter is remanded for resentencing for the trial court to (1) exercise its discretion under sections 12022.53, subdivision (h), and 12022.5, subdivision

(c), as to whether to strike the firearm enhancements imposed under sections 12022.53 and 12022.5; (2) resentence defendant on the section 12022.5, subdivision (a), enhancement attached to count four if it does not strike that enhancement; and (3) exercise its discretion under section 1385 as to whether to strike the five-year section 667, subdivision (a), enhancement. The judgment is otherwise affirmed. The trial court shall prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

                                                   _____

                                                   HULL, J.

We concur:

_____
BLEASE, Acting P. J.

_____
DUARTE, J.