Filed 8/26/22  P. v. Christopher CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTORIA CHRISTOPHER,<br><br>    Defendant and Appellant. | D078892<br><br><br><br>(Super. Ct. No. SCD285304) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed in part; reversed in part.

Benjamin Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

In early January 2020, defendant Victoria Christopher became enraged when she perceived another driver pulled in front of her car while she was in line at a gas station.  Christopher got out of her car and demanded the other

driver move his car. When he refused, she referenced the Lincoln Park Bloods criminal street gang and threatened to shoot him and his car. When the driver again refused to move, Christopher returned to her car, pulled out a silver-colored handgun, and, as she approached him, demanded a third time he move. When the driver refused, Christopher shot both of his car's front tires and then left the scene.

A jury convicted Christopher of five counts, four of which (counts 1 through 4) arose from the January 2020 incident: shooting at an unoccupied vehicle (Pen. Code, § 247, subd. (b)—count 1);[1] felon in possession of a firearm (§ 29800, subd. (a)(1)—count 2); discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a)—count 3); attempted criminal threat (§§ 422, 664—count 4); and possession of a controlled substance (Health & Saf., § 11350, subd. (a)—count 5). The jury also found true she personally used a deadly weapon (i.e., handgun) in the commission of counts 1 and 3 (§ 1192.7, subd. (c)(23)); and personally used a firearm in committing an attempted criminal threat on count 4 (§ 12022.5, subd. (a)). Christopher admitted she suffered a serious felony strike prior.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The trial court sentenced Christopher to the middle term on counts 1 through 4, added five years for the serious felony prior, and imposed a prison term of 10 years four months.[2]

In her opening brief Christopher raises two issues: (1) the trial court erred in admitting evidence of her gang affiliation; and (2) there was insufficient evidence to support the jury's true finding on the gun-use enhancement.

In response, the People contend the trial court properly admitted evidence of Christopher's gang affiliation, and sufficient evidence supports the jury's true finding on the gun-use enhancement.

In a supplemental brief, Christopher contends remand for resentencing is warranted under Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5.3), effective January 1, 2022. As relevant here, Assembly Bill No. 124 amended section 1170 to make a low-term sentence presumptively appropriate when a defendant's "childhood trauma" is a "contributing factor" to the defendant's commission of an offense. (§ 1170, subd. (b)(6)(A).) Christopher contends she submitted sufficient information of trauma entitling her to a new sentencing hearing.

---

[2] Count 1—four years (doubled due to the strike prior); count 2—16 months (one-third, doubled); count 3—four years (doubled, but stayed under former section 654, subdivision (a)); count 4—two years concurrent (not doubled because the strike was stricken on this count); count 5—credit for time served; and five years for the serious felony prior (§§ 667, subds. (b)-(i), 1170.12). In response to correspondence from the Department of Corrections and Rehabilitation requesting it review Christopher's Sentencing Minute Order and/or prior Abstract of Judgment, on July 21, 2022, the trial court issued an ex parte order striking Christopher's punishment on the enhancement tied to count 4.

In their supplemental brief, the People agree Assembly Bill No. 124 retroactively applies to Christopher but maintain remand is unnecessary because the sentencing hearing transcript clearly indicates that the trial court would have found imposition of the low term "contrary to the interests of justice" under amended section 1170, subdivision (b)(6).

As we explain, we conclude the trial court did not err in admitting the gang evidence because Christopher herself injected the gang reference into the crime and her gang affiliation was probative of the specific intent element of attempted criminal threat. We also conclude substantial evidence supports the jury's true finding that Christopher used a firearm "in the commission of" the attempted threat.

Concerning sentencing, we agree Assembly Bill No. 124 applies retroactively to Christopher. In light of the extensive information in the record regarding "childhood trauma" Christopher experienced and the lack of any mention of such trauma as a mitigating circumstance in the probation report and at the sentencing hearing, we conclude remanding the matter for a full resentencing hearing would not be an idle act. We therefore vacate Christopher's sentence but otherwise affirm the judgment.

## FACTUAL OVERVIEW
### Prosecution Evidence

#### *Shooting*

On the afternoon of January 2, 2020, victim J.L. was waiting to pump gas at a station in San Diego. While in line, a black car pulled up in front of his car and its female driver got out. As J.L. opened his car door to go inside and pay for gas, the female—later identified as Christopher—yelled, " 'You dumbass motherfucker.' " Initially, J.T. did not realize Christopher was talking to him. Christopher appeared upset and asked J.L. if he had not seen

4

her also waiting in line. Christopher demanded that J.L. move his car. He calmly refused.

J.L. testified Christopher became even more upset and "started yelling about Lincoln Park Bloods." She also yelled, " 'On my mama and my baby, I'm going to shoot you and your car' " and " 'Today is the day.' " J.L. responded, " 'Do what you got to do.' " J.L. knew the Lincoln Park Bloods was a local gang and that someone claiming to be a member would make these statements in an attempt to intimidate him.

J.L. grew concerned when he saw Christopher return to her car and reach inside the driver's side rear door. Christopher pulled out a silver-colored revolver and began walking toward J.L., who was standing near his car. From a distance of about six feet, Christopher again demanded J.L. move his car and he again refused. Christopher then fired two shots into one of his car's front tires. She then went to the other side of the car and fired a single shot into the other front tire.

J.L. initially was not sure the gun was a "real" firearm because his tires did not immediately deflate. As Christopher walked back to her car, J.L. used his cellphone to take two pictures, one of her holding the gun and the other of the license plate of her car. Christopher got into her car and drove off. While J.L. was on the phone with 911, he saw his tires deflating. A surveillance camera at the scene recorded the incident, which was played for the jury. Also played for the jury was the recording of the 911 call by J.L.

In the 911 call, J.L. reported a female had just shot the front tires of his car. He believed the gun was a .22 caliber or a "cap gun" because it was "small." J.L. told the dispatcher that a female started yelling at him while he was waiting at the gas pump; that he did not realize she also was waiting to

5

pump gas because she was stopped in the street; and that she told him "she was a Lincoln Park ah, blood."

J.L. testified he was concerned for his safety when he saw Christopher walking toward him with a gun in her hand. Christopher never pointed the gun at him and he was more surprised than scared when she actually shot his car's tires.[3]

That same day, J.L. had his car towed to a garage. A mechanic found three projectiles inside the front tires of J.L.'s car while replacing them. J.L. put the projectiles in a sanitized "lab bag"[4] and subsequently turned them over to law enforcement.

### *Investigation*

Detective Jonathan Bamba was assigned to investigate the January 2 incident. Based on the photograph taken by J.L. at the crime scene, he opined Christopher was in possession of a firearm and not a "BB" gun. The other photograph showed the license plate number of the car driven by the suspect. Detective Bamba ran the plate and found the car was registered to Christopher.

Detective Bamba met with J.L. in early February 2020. J.L. turned over the projectiles removed from his car tires. After examining the expended projectiles, Detective Bamba determined they had been fired from a "real" firearm. He nonetheless submitted them for forensic testing.

In mid-February 2020, Christopher was arrested for the January 2 incident. Christopher's car was found in a parking lot and Detective Bamba

---

[3]    Because of the lack of evidence J.L. was in "*sustained* fear" (italics added), the offense in count 4 was for attempted criminal threat.

[4]    J.L. testified he was a health-care professional who often made house calls.

observed its description matched the car in the photograph taken by J.L. Detective Bamba and other officers conducted a lawful search of the car and found what later was determined to be .39 grams of cocaine base inside the driver's side door panel.

A firearms expert analyzed the three projectiles taken from J.L.'s tires and determined they were bullets expended from a .38 caliber revolver. The expert opined the bullets sustained "impact damage" and "flattened out" because they struck a surface with more resistance than the bullet itself, which was consistent with them striking a steel-rimmed tire.

A validly executed search warrant of Christopher's social media account included online communications between her and R.D., the father of their child. During several of these communications, Christopher referenced a firearm.

For example, on November 11, 2019, Christopher wrote R.D., " 'Gimme my shit back,' " then " 'Start with that,' " and also, " 'Then you can worry about getting me my *pistol*, earrings and money, fuckin retard.' " (Italics added.) The following day, during another exchange between Christopher and R.D. in which Christopher kept asking for her " 'shit back,' " she wrote, " 'Where's my pistol, [R.D.]?' " which she followed up with further references to her " 'pistol.' "

The People's gang expert testified that throughout the online posts between Christopher and R.D., she repeatedly referred to R.D. as "Blood" and herself as " 'Lucky' " and " 'Lucky Charm' "; replaced the letter "c" with the letter "k" in multiple messages; and in one post even mentioned "Lincoln Park Day," an annual event that takes place on March 17, the same day as St. Patrick's Day.

The expert opined that collectively these posts were "consistent with someone who is associated with Lincoln Park Bloods." The expert further opined that Blood gang members do not like the letter "c" because it's associated with their rival gang set, the Crips; and that Christopher, prior to firing the gun, referenced her gang in an attempt to intimidate J.L. and make him fearful.

### Defense Evidence

Christopher testified in her own defense. As she approached the gas station in her car, J.L. cut her off and got in line ahead of her to pump gas. Christopher, already mad from an unrelated event, asked J.L. if he saw her waiting for gas. J.L. claimed he did know Christopher was in line. Believing J.L. was being untruthful, Christopher "immediately got pissed off," called him a " 'retarded ass,' " and, when he seemed unconcerned, said, " 'I'm going to shoot out each and every one of your motherfucking tires.' "

Christopher returned to her car and retrieved a "pellet gun." She then fired a shot into one of J.L.'s tires and, when the tire did not lose air quickly enough, she fired a second shot into that tire. She then went around J.L.'s car and shot his other front tire. Christopher admitted she "overreact[ed]" during the incident. She then got in her car and left because she "had stuff to do" and a "busy" schedule that day.

Christopher testified she was given the nickname "Lucky Charms" or "Lucky" by her stepdad when she was young.

### DISCUSSION

### I. Gang Evidence

Christopher contends the trial court erred in admitting evidence that she was affiliated with the Lincoln Park Bloods, arguing under Evidence

8

Code section 352 this evidence was minimally probative and unduly prejudicial.[5]  We disagree.

## A.  *Additional Background*

In a motion in limine, Christopher argued any reference to Lincoln Park Bloods should be excluded at trial because she was not charged with any gang-related crime or allegation; this evidence had nothing to do with the pending charges; and whether she intended to threaten and intimidate J.L. could be determined by means other than through gang evidence, including from their interactions during the incident, the "tone" of her statements, and her subsequent action in retrieving the gun.

The People, on the other hand, in their motion in limine to admit the gang evidence argued that such evidence was highly probative, because, as pertinent to the issue on appeal, it "demonstrate[ed]  the depth of intent behind Defendant's threats to shoot the victim."  The People also argued their expert would opine that Christopher was an "associate" of the Lincoln Park Bloods gang based on the records from her social media account (summarized *ante*).  However, the prosecutor at the in limine motion hearing noted he had no intention of making this "a gang case," and his use of the gang evidence would be accordingly limited.

The trial court inquired of defense counsel why Christopher's gang reference during the incident was not probative of her "intended . . . threat, which is one of the . . . elements of an Attempt [under section] 422?" to which defense counsel responded, "Right," but added, "I don't believe that the gang affiliation . . . does anything to threaten the victim."  Although recognizing

---

5    Although Christopher challenged the admission of the gang evidence on additional grounds in the trial court, on appeal she relies solely on Evidence Code section 352 in arguing this claim of error.

9

this was not a gang case, the trial court ruled to admit the reference to the Lincoln Park Bloods street gang, finding it was probative of identity and the specific intent to commit attempted assault.

The trial court also addressed the gang evidence from Christopher's social media account. It asked the prosecutor to "streamline" what evidence he wanted submitted, which the court would consider at a later hearing, noting some of the social media evidence would be admitted but it would be limited.

At a subsequent hearing, the trial court revisited the admissibility of the social media gang evidence. The trial court reviewed each item the prosecutor sought to introduce and, based on substantial argument by the parties, continued to "limit" what would be admitted at trial. It then ruled, "And so after weighing and balancing under [Evidence Code section] 352, I'll find it's relevant. And I find the probative value outweighs any of the prejudicial."

## B. *Guiding Principles*

Evidence is admissible only if it is relevant. (Evid. Code, § 350.) All relevant evidence is admissible except as otherwise provided by a statutory or constitutional exclusionary rule. (See Cal. Const., art. I, § 28, subd. (f)(2); Evid. Code, § 351.) Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) The general test of relevance " 'is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117.)

A trial court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will

(a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 (*Rodrigues*).) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Ibid.*)

The defendant has the burden on appeal to establish an abuse of discretion. (See *People v. Hendricks* (1988) 44 Cal.3d 635, 646.) "[S]tate law error in admitting evidence is subject to the traditional *Watson*[6] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*); see *ibid.* [federal due process is offended only if admission of the irrelevant evidence renders the trial fundamentally unfair].)

In cases not involving a gang enhancement, "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) "But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation . . . can help prove identity, motive, modus operandi, specific

_____

6      *People v. Watson* (1956) 46 Cal.2d 818.

11

intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid.*)

**C. *Analysis***

Christopher contends the trial court prejudicially erred in admitting her statement referencing the Lincoln Park Bloods during the January 2 incident and evidence from her social media account that supported her affiliation with this gang. Although she admits the gang evidence was probative of her "intent" in connection with the attempted criminal threat, Christopher nonetheless contends whether or not she was in fact associated with this gang was irrelevant because J.L. was a stranger to her.

Here, we cannot conclude the trial court abused its broad discretion in admitting the challenged gang evidence. First, this evidence was probative of the circumstances that led up to Christopher shooting J.L.'s car tires. The record shows Christopher *herself* injected the Lincoln Park Blood gang into the dispute when she attempted to frighten J.L., after he *initially* refused to move his car when he allegedly cut the line at the gas station. (See *Hernandez, supra*, 33 Cal.4th at pp. 1050-1051 [rejecting the argument of the defendant that gang evidence caused him undue prejudice with the jury when the defendant referenced his gang before robbing the victim, noting the defendant "injected his gang status into the crime" and "identified himself as a gang member . . . to use that status in demanding money from the victim"].)

Christopher's reference to her gang affiliation came after she again demanded that J.L. move his car. When he again refused, she became even more angry, threatened to shoot J.L. and his car, and made good on one of those threats by retrieving a gun from her car and shooting the front tires of his car. Thus, Christopher's *own* reference to the gang and her affiliation with the gang through her social media account gave context to her attempt

to frighten J.L., a complete stranger, within minutes of shooting his car tires. (See *Hernandez, supra*, 33 Cal.4th at pp. 1050-1051; see also *People v. Duong* (2020) 10 Cal.5th 36, 63-65 [although, as here, no gang allegations were charged, gang evidence was relevant to give "context to the shooting" and explained the "defendant's willingness to shoot a complete stranger minutes after a verbal spat"]; see also *id*. at p. 65 [noting such evidence did not have to be dispositive of the disputed fact in order to be admissible].)

Second, we cannot conclude the gang evidence was more prejudicial than probative. As noted, the record shows the court severely limited the gang evidence that would be admitted at trial, recognizing, as did the prosecutor, that, in cases not involving a gang enhancement, such evidence "is potentially prejudicial and should not be admitted if its probative value is minimal." (See *Hernandez, supra*, 33 Cal.4th at p. 1049.)

Indeed, the record shows during cross-examination of the People's gang expert, the prosecutor requested a sidebar after *defense counsel* asked the expert if Christopher was a "documented gang member." During a reported sidebar, the prosecutor expressed concern over this question, as it could "open Pandora's box" and lead to unwanted additional gang evidence being admitted, despite the trial court's desire to limit such evidence. The prosecutor noted the jury might not be able to distinguish between a "documented" gang member and a person merely "associated" or affiliated with a gang. The trial court agreed the question posed by defense counsel was "risky."

In the reported chambers meeting, the record shows the expert would have testified that Christopher was a "documented" member of the Lincoln Park Bloods criminal street gang. The trial court told the parties, "[W]e don't want to go there," and suggested defense counsel "might want to consider

13

whether or not you're going to ask a different question" of the expert. The court "thank[ed]" the prosecutor for flagging this issue before Pandora's box was opened, and ruled the People's expert would not be allowed to testify Christopher was a documented gang member. The expert responded he was specifically advised "not to go down that road."

Once in open court, defense counsel rephrased the question and the expert confirmed Christopher merely "associate[d]" with the Lincoln Park Bloods gang.

Thus, the record shows the trial court *and* the prosecutor were careful to limit the scope of the gang evidence heard by the jury. On this record, we cannot say the trial court's decision to admit the limited gang evidence was "arbitrary, capricious or patently absurd." (See *Rodrigues, supra,* 8 Cal.4th at p. 1124.)[7]

Third, even if the trial court erred in admitting the gang evidence, we conclude that error was harmless under *Watson.* (See *Partida, supra,* 37 Cal.4th at p. 439; see also *People v. Roberts* (2017) 13 Cal.App.5th 565, 576 (*Roberts*) ["Ordinarily, the erroneous admission of evidence is reviewed for prejudice under the standard described in . . . *Watson* . . . , which requires reversal only if the defense shows it is reasonably probable that a result more

---

7     In light of our conclusion the gang evidence was properly admitted at trial, we reject Christopher's contention that her due process rights were violated by admission of this evidence. (See *People v. Esayian* (2003) 112 Cal.App.4th 1031, 1042 ["A person seeking to overturn a conviction on due process grounds bears a heavy burden to show the procedures used at trial were not simply violations of some rule, but are fundamentally unfair."]; see also *People v. Albarran* (2007) 149 Cal.App.4th 214, 232 [noting it is "rare and unusual" for the erroneous admission of evidence to violate a defendant's due process rights].)

favorable to the appealing party would have been reached in the absence of the error."].)

Here, the evidence of Christopher's guilt is strong, and the evidence supporting a different outcome is comparatively weak. (See *People v. Breverman* (1998) 19 Cal.4th 142, 177.) Christopher admitted threatening to use—and using—a gun to shoot J.L.'s car's tires because she was "pissed off" at J.L. for allegedly cutting the line at the gas station. In addition, one of the People's experts provided uncontroverted testimony that the three bullets recovered from J.L.'s tires were fired from a real firearm, such as a .38 caliber revolver, and not from a "pellet" gun as Christopher claimed. Finally, J.L. took a picture of Christopher holding a silver revolver at the scene of the incident and of her car's license plate number.

Based on this other evidence, we conclude it is not reasonably probable that a result more favorable to Christopher would have been reached absent the purported error in admitting the limited gang evidence in this case. (See *Partida, supra*, 37 Cal.4th at p. 439; *Roberts, supra*, 13 Cal.App.5th at p. 576.)

## II.

### Sufficiency of the Evidence and the Firearm Enhancement

Christopher next contends the jury's true finding she used a firearm in committing the attempted criminal threat is not supported by substantial evidence because she did not fire the weapon until *after* the threat was completed. We again disagree.

#### A. *Guiding Principles*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that

15

is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944; see *People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.)

"In applying this test, we . . . presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Ibid.*) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid.*) If substantial evidence supports the judgment, we must affirm, even if there is also substantial evidence to support a contrary conclusion and the jury might have reached a different result if it had believed other evidence. (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1165-1166.)

Section 12022.5, subdivision (a) states in relevant part: "[A]ny person who personally uses a firearm *in the commission of* a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense." (§ 12022.5, subd. (a), italics added.)

**B. *Analysis***

We must decide whether substantial evidence supports the true finding that Christopher used the firearm "in the commission of" the attempted criminal threat.

"Whether a defendant used a firearm in the commission of an enumerated offense is for the trier of fact to decide. [Citation.] We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.] Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*People v. Wilson* (2008) 44 Cal.4th 758, 806 (*Wilson*).)

As relevant here, in *Wilson* the defendant argued the enhancement term of four years each under former section 12022.5, subdivision (a) "must be vacated for lack of sufficient evidence he used a firearm in connection with the rapes." (*Wilson*, *supra*, 44 Cal.4th at p. 806.) In rejecting this contention, the *Wilson* court first concluded the word "use" in former section 12022.5 " 'means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." [Citation.] The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that "uses" be broadly construed.' " (*Wilson*, at pp. 807-808.)

The *Wilson* court next took up the issue most relevant in the instant appeal involving the timing of the "use" of a firearm "in the commission of" the underlying felony. It relied in part on *People v. Masbruch* (1996) 13 Cal.4th 1001 (*Masbruch*) for this analysis.

In *Masbruch*, the defendant kidnapped L.R. and her family at gunpoint and threatened to kill her, her three kids, and her boyfriend. The defendant then raped L.R. twice, in two different locations, as a gun was being passed between the various codefendants. "Under these circumstances, the entire 'video' of the lengthy criminal encounter between defendant and L.R., beginning with his initial display of the firearm to terrorize her and her family, his threats to use the gun on all of them, and his actual use of it to

17

injure [a third party], is sufficient to prove he used the firearm when he raped L.R. on both occasions." (*Wilson*, *supra*, 44 Cal.4th at p. 807, citing *Masbruch*, *supra*, 13 Cal.4th at p. 1011.)

The *Wilson* court thus recognized that the " 'use' " of the firearm must not "be strictly contemporaneous with the base felony." (*Wilson*, *supra*, 44 Cal.4th at p. 807.) " 'In considering whether a gun use occurred, the jury may consider a "video" of the entire encounter; it is not limited to a "snapshot" of the moments immediately preceding a sex offense. Thus, a jury could reasonably conclude that although defendant's presence with the victims [in *Masbruch*] was sporadic, the control and fear created by his initial firearm display continued throughout the encounter.' [Citation.] Accordingly, defendant's jury was instructed that '[a] gun need not be continually displayed during the course of a crime in order for it to be personally used within the meaning of Penal Code section 12022.5, [s]ubdivision (a).' " (*Wilson*, at p. 807.)

Applying *Masbruch*, the *Wilson* court rejected the defendant's argument that there was no evidence he possessed a gun at the time of either rape. The Supreme Court instead concluded the defendant was improperly attempting to "compartmentaliz[e]" the "ongoing criminal event," treating it as a mere " 'snapshot' " of the crime and not a " 'video.' " (*Wilson*, *supra*, 44 Cal.4th at p. 808, quoting *Masbruch*, *supra*, 13 Cal.4th at p. 1011.) *Wilson* thus concluded substantial evidence supported the imposition of the two section 12022.5 firearm enhancements. (*Wilson*, at p. 808; see *People v. Jones* (2001) 25 Cal.4th 98, 110 [concluding the use of a deadly weapon within the

meaning of section 12022.3, subdivision (a)[8] occurs " 'in the commission of' " a specified sex offense "if it occurred *before, during, or after* the technical completion of the felonious sex act"]; see also *People v. Calles* (2012) 209 Cal.App.4th 1200, 1222 (*Calles*) [noting the phrase "in the commission of," for purposes of section 12022.7, subdivision (a),[9] " 'has been given an expansive, not a tailored meaning' "]; *People v. Frausto* (2009) 180 Cal.App.4th 890, 902 (*Frausto*) [" '[I]n the commission of' [for purposes of section 12022.53, subdivision (d)[10]] is not the same as 'while committing,' 'while engaged in,' or 'in pursuance' "; "[t]emporal niceties are not determinative and the discharge of a gun before, during, or after the felonious act may be sufficient if it can fairly be said that i[t] was a part of a continuous transaction."].)

---

8      Section 12022.3 provides in part: "For each violation of Section 220 involving a specified sexual offense, or for each violation or attempted violation of Section 261, 264.1, 286, 287, 288, or 289, or former Section 262 or 288a, and in addition to the sentence provided, a person shall receive the following: [¶] (a) A 3-, 4-, or 10-year enhancement if the person uses a firearm or a deadly weapon *in the commission of* the violation." (§ 12022.3, subd. (a), italics added.)

9      Subdivision (a) of section 12022.7 provides: "Any person who personally inflicts great bodily injury on any person other than an accomplice *in the commission of* a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a), italics added.)

10      Subdivision (d) of section 12022.53 provides: "Notwithstanding any other law, a person who, *in the commission of* a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (§ 12022.53, subd. (d), italics added.)

19

Here, giving the words "in the commission of" in section 12022.5, subdivision (a) an expansive meaning (see *Calles*, *supra*, 209 Cal.App.4th at p. 1222) and recognizing the gun use can occur "before, during, or after" the felonious or attempted felonious act if it can be "fairly said it was part of a continuous transaction" (see *Frausto*, *supra*, 180 Cal.App.4th at p. 902), we conclude that substantial evidence supports the jury's findings that Christopher "use[d]" the firearm "in the commission of" the attempted criminal threat.

The record shows the entire incident—beginning with Christopher's attempts to intimidate J.L., including by referencing the Lincoln Park Bloods criminal street gang, her threats to shoot him and his car, and culminating in her shooting the front tires of his car—lasted just a few minutes, took place at the same gas station, and involved the same victim. Guided by *Wilson* and *Masbruch*, we reject Christopher's attempts to "compartmentaliz[e]" the "ongoing criminal event," treating the event as a mere " 'snapshot' " rather than a " 'video.' " (See *Wilson*, *supra*, 44 Cal.4th at p. 808; *Masbruch*, *supra*, 13 Cal.4th at p. 1011.) We thus reject this claim of error.

## III.

### Assembly Bill No. 124

In supplemental briefing, Christopher contends she is entitled to a new sentencing hearing pursuant to Assembly Bill No. 124. This law amended section 1170 to create a rebuttal presumption favoring a low-term prison sentence when, as relevant here, a defendant's "childhood trauma" is a "contributing factor in the commission of the offense" and its imposition would not "be contrary to the interests of justice." (§ 1170, subd. (b)(6)(A).) We agree.

## A. *Additional Background*

Prior to sentencing, Christopher filed a statement in mitigation and a *Romero*[11] motion asking the trial court to dismiss the serious felony prior.[12] In support, Christopher attached multiple pages of exhibits, including a nine-page psychological evaluation dated April 29, 2021 by a psychologist who previously had evaluated Christopher; letters by family and friends; and her own letters explaining her "horrible childhood" and the circumstances of the current offenses. Letters from Christopher's siblings described their parents' home as "not a safe place for children," their mother as being "unfit to parent," and "various traumatizing" events from childhood including witnessing multiple incidents of domestic violence by their parents and their parents leaving them unattended for "weeks" at a time. Despite these challenging circumstances, Christopher's siblings noted she "excelled academically" in school and is a "beautiful person" with a "good heart," a sentiment also shared by others close to her who wrote letters in support that described many of Christopher's positive attributes, including most notably the love she has for her young daughter.

The psychological evaluation indicated Christopher was born to parents who had extensive drug and criminal histories. Christopher described being the victim of sexual assault when she was about five years old and being "on her own on the street[s]" when she was about 15.

---

11     *People v. Romero* (1996) 13 Cal.4th 497, 504.

12     Although the documents in support of the motion are included, it does not appear the motion itself is part of the record. On appeal, Christopher has not challenged the trial court's ruling denying her motion to dismiss the serious felony prior.

The psychological evaluation concluded Christopher suffered from "Unspecified Anxiety and Depressive Disorders"; and "Other Specified Trauma—and Stressor-Related Disorder (Parental *Neglect* and *Abuse*)[.]" (Italics added.) The psychologist noted he previously had recommended Christopher undergo treatment to avoid "expressing herself aggressively"; and that, "[u]ntil she learn[s] to control her emotions, she will be at risk for similar responses" as occurred in the current case.

In addition to the psychology evaluation and exhibits in support of the statement in mitigation, a probation report was submitted. The probation report identifies several circumstances in aggravation but *none* in mitigation. When the report was being prepared, Christopher told the interviewer it had been " 'hard for [her] to control [her] reactions during the trial' " and admitted she "overreact[ed]" in committing the instant offenses.

The probation report also reviewed Christopher's extensive criminal history dating back to January 2004 when she was a juvenile. Before the instant offenses, Christopher had been granted formal probation five times and summary probation five times; that due to noncompliance, she was revoked "numerous" times and "continued to reoffend while on probation"; that when she was arrested for the instant offenses, she was on parole and a grant of parole had "been revoked seven times"; and that "[o]verall, her adjustment to probation and parole is considered poor" as "she has chosen, or is unable, to prevent violent outbursts." Christopher's COMPAS[13] score, an indicator used to predict recidivism, was reported as "HIGH."

At sentencing, the trial court indicated it had read the information Christopher submitted in mitigation and in support of her *Romero* motion, as

_____

13    COMPAS is an acronym for Correctional Offender Management Profiling for Alternative Sanction.

22

well as the probation report.  The trial court specifically inquired whether Christopher wanted to give a statement, or submit any additional "documents" or "evidence" for the court to consider prior to imposing sentence.

Christopher responded she had already submitted letters for the trial court's consideration.  She acknowledged overreacting when she shot the victim's tires, apologized for her acts, and, based on the psychology evaluation, recognized her conduct in part was due to "fear" and the "need to protect herself."

In asking the trial court to dismiss the serious felony prior, defense counsel noted that although Christopher's adult record showed 17 convictions, 14 of those were misdemeanors and most were theft-related as a result of Christopher living on the streets; and that Christopher's serious felony prior involved shoplifting but became a strike when a "steak" or "butter" knife was found in her purse.  Counsel thus argued Christopher was outside the spirit of the Three Strikes law, and instead needed treatment to learn "coping mechanisms."

The prosecutor opposed dismissal of the serious felony prior, and requested the trial court follow the probation report's sentencing recommendation of 10 years four months with one exception.  The prosecutor argued the trial court should also impose the middle term on count 4, attempted criminal threat, double the term, and sentence Christopher to an additional eight months to "run consecutive," for a total term of 11 years.

In refusing to dismiss the serious felony prior, the trial court stated it had "weighed and balanced looking for a way which logically would get me to the place where I believe it would be fair to grant a *Romero* motion."  The trial court followed the probation report's recommendation and sentenced

23

Christopher to 10 years four months. In so doing, the trial court never discussed whether it had considered Christopher's "childhood trauma" as a circumstance in mitigation or explained why it imposed the middle term.

**B.** *Guiding Principles*

When Christopher was sentenced in May 2021, former section 1170, subdivision (b) provided that the sentencing between the low, middle, and upper term "shall rest within the sound discretion of the court" based on which term "best serves the interests of justice." (Former § 1170, subd. (b).)

Effective January 1, 2022, Assembly Bill No. 124 amended section 1170, subdivision (b)(6) to make the low term the preferred sentence under certain circumstances including when the "[t]he person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence" that is "a contributing factor in the commission of the offense" (§ 1170, subd. (b)(6)(A); "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances" such that "imposition of the lower term would be contrary to the interests of justice" (*id.*, (b)(6)).

**C.** *Analysis*

We agree with the parties that amended section 1170 applies retroactively to Christopher as an " 'ameliorative change[]' " in the law applicable to all nonfinal convictions. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308, quoting *In re Estrada* (1965) 63 Cal.2d 740, 742 [when the Legislature lessens the penalty for a crime, an inference arises that it intended the lighter penalty to apply provided the judgment is not final]; *People v. Frahs* (2020) 9 Cal.5th 618, 628-629 [*Estrada*'s retroactivity rule applies to statutes that make a reduced punishment possible].)

The parties, however, disagree whether Christopher is entitled to relief under Assembly Bill No. 124.

Where an ameliorative statute like section 1170 is retroactive, a remand is appropriate unless "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*); accord *People v. Flores* (2020) 9 Cal.5th 371, 431-432.)

Here, there is no "clear indication" of the sentencing decision the trial court would have made had it considered the new requirements of Assembly Bill No. 124. (See *Gutierrez, supra*, 58 Cal.4th at p. 1391.) As noted, the probation report did not identify any circumstances in mitigation when recommending imposition of the middle term. Nor did the trial court discuss its reasoning for imposing the middle term, including whether (or not) it had considered as a mitigating circumstance the voluminous information Christopher submitted regarding her "childhood trauma." (See § 1170, subd. (b)(6)(A).) This information, including most notably the detailed psychology evaluation prepared in anticipation of sentencing, supports the inference that Christopher's prior trauma may have played a role in her commission of the offenses, thereby triggering the low-term presumption.[14]

The People, however, argue remand is a futile act because at sentencing the trial court found Christopher was a "serious danger to society." The People argue this finding is a clear indication that the trial court would find the low term "contrary to the interests of justice." (See

---

[14] We only decide whether Christopher is entitled to remand for resentencing under Assembly Bill No. 124 and offer no opinion regarding the possible terms of her sentence under this or any other law. Those are questions best left to the trial court to answer on remand.

§ 1170, subd. (b)(6); see also *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [noting when the " ' "record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required" ' "].)

But we note the trial court's dangerousness finding was in the context of denying Christopher's *Romero* motion. The inquiry in deciding whether to strike a serious or violent felony prior turns on whether a defendant is "outside the spirit" of the Three Strikes law (*People v. Williams* (1998) 17 Cal.4th 148, 161); and relief from a Three Strikes sentence is available only when "extraordinary circumstances" exist (*People v. Carmony* (2004) 33 Cal.4th 367, 378 [noting the circumstances " 'must be extraordinary' " under which a defendant meeting the statutory conditions of a Three Strikes sentence " 'fall[s] outside the spirit of the . . . scheme' "]). No such requirements exist in amended section 1170, which creates a presumption to impose the low term if specified conditions exist. (§ 1170, subd. (b)(6).) Assembly Bill No. 124 stands in stark contrast to the "strong presumption that any sentence that conforms [to the Three Strikes] sentencing norms is both rational and proper." (*Carmony*, at p. 378.)

In addition, we note the trial court tempered its dangerousness finding when it stated it was looking for a "way which logically would get me to the place where I believe it would be fair to grant a *Romero* motion." This statement suggests leniency by the trial court in sentencing Christopher.

Here, given the extensive information in the record regarding the "abuse," "neglect," and "sexual violence" Christopher suffered as a child (see § 1170, subd. (b)(6)(A)) and the lack of any clear indication the trial court would impose the middle term and not the presumptive low term as provided under amended section 1170, we conclude Christopher's sentence must be

26

vacated and the matter remanded for a full resentencing hearing. At that hearing, the trial court may revisit all of its sentencing choices in light of new and applicable legislation, including Assembly Bill No. 124. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate' "]; see also *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

## DISPOSITION

Christopher's sentence is vacated and the matter remanded for a full resentencing. In all other respects the judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:

O'ROURKE, J.

BUCHANAN, J.

27